[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————————

No. 05-13819
Non-Argument Calendar

————————————————————

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 9, 2006
THOMAS  K. KAHN
CLERK

Agency No. A96-437-751

MARYSE ANGODO,

                                                        Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                        Respondent.

————————————————————

Petition for Review of a Decision of the
Board of Immigration Appeals

————————————————————

**(February 9, 2006)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Petitioner, Maryse Simphonie Angodo, petitions for review of the final order

of the Board of Immigration Appeals ("BIA"), which adopted the decision of the immigration judge ("IJ") ordering removal, denying asylum and withholding of removal under the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1158, 1231, and relief under the United Nations Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c). Substantial evidence supports the IJ's adverse credibility finding and the determination that Angodo failed to meet her burden of proof for asylum and withholding of removal under INA and CAT. Accordingly, we DENY the petition.

## I. BACKGROUND

Angodo's Entry into the United States

On 25 January 2003, Angodo, a native and citizen of Abidjan, Cote d'Ivoire,[1] arrived at Hartsfield Airport in Atlanta. An Immigration and Naturalization Service ("INS")[2] officer determined that Angodo, who was 30 years old at that time, had willfully misrepresented herself by claiming upon arrival to be on a one-month visit when she actually intended to seek refuge in the United

---

[1] The record refers to Angodo's country of origin, alternately, as Cote d'Ivoire and Ivory Coast (its former name). For consistency, we use Cote d'Ivoire throughout.

[2] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2125. The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department. However, because this case was initiated while the transfer was still in progress, this opinion refers to the agency as the INS when applicable.

2

States.  Angodo admitted to the officer that she had first said she was entering the United States only to visit her sister, but that she intended to seek refuge because she was scared to return to Cote d'Ivoire "because of a civil war" and because "it's not secure right now to be [there]."  Administrative Record ("AR")  at 222.  She was four months pregnant at the time of her arrival.  The INS issued a determination of inadmissibility, charging her with removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I), (a)(6)(C)(i), as an alien who, by fraud or willful misrepresentation of a material fact, seeks to procure admission into the United States or other benefit.

A. Asylum Interview

During an interview with an asylum officer, Angodo stated that she was married and had an eight-year-old son attending school in Cote d'Ivoire, but that her husband's location was unknown.  She contended that her husband had been taken away by four people in December 2002, but she did not know who had taken him because she had been in the bedroom when it happened.  She had gone as far as confirming that he was not being held by the police, but they "did not offer to look for him."  Id. at 213.

She claimed that she feared harm upon return to Cote d'Ivoire because the Republican Rally ("RDR") was leading a rebellion there, and she had heard of

3

RDR members kidnaping people, some of whom "disappear[ed] forever." Id. She asserted that her husband was a supporter of the former president and that she was a member of an evangelist religious group that opposed the RDR, which is predominately Muslim. She told the asylum officer that she believed that the RDR or "rebels" kidnaped her husband. Id. at 215. The asylum officer found a "significant possibility that the assertions underlying [Angodo's] claim could be found credible in a full asylum or withholding of removal hearing" and that she had established a nexus between her fear and both her political opinion and her husband's imputed opposition to a rebel group. Id. at 214.

B. Asylum Application

Angodo then applied for asylum and withholding of removal based on her political opinion and religion, but not on membership in a social group. See id. at 264. She explained that she and her husband were both "Evangelical Christians" and members of the ruling Ivoirian Popular Front party ("FPI") and that she had been a spokesperson in charge of encouraging women and children to join the party. Id. at 264-65. She reported that in late 2000, after marching in support of the newly elected FPI affiliated president, she was walking with three other women when they "were pulled into a[n] RDR van." Id. at 269. Four RDR rebels then "took [them] to a local park" and raped them. Id. Angodo asserted that this

4

commonly happened to female FPI members.

She stated that "[o]ver the next [two] years [her] home was broken into by rebels on [three] different occasions," and that although she and her husband had moved once, it had been within the same neighborhood.  Id.  She further reported that in December 2002, "[f]our men dressed in police uniform came to [her] home at night and took [her husband] away without saying who they were or where they were taking him."  Id.  She stated that they made her husband watch as they "threw [her] down on the floor and began to kick [her] belly, . . . hit [her] across the face with the end of their guns . . . [breaking her tooth] . . . [and] . . . raped [her]."  Id.  She reported that she had not seen her husband since, and although she was not sure whether the men were police or rebels, she could "only assume they were rebels."  Id. at 265, 269.

Angodo further stated in her application that she feared returning to Cote d'Ivoire because her neighbors told her that the kidnapers came back to her home in search of her a few days after kidnaping her husband.  She claimed that although the FPI is in power, the police often "co[lla]oborate with the rebels," "no one can control the rebels anymore," and they often kidnap and kill Christian FPI members.  Id. at 264, 269.  She explained that she had not asked for asylum when her plane landed in Paris because she was "in transit" and did not leave the airport.  Id. at

5

266. She stated that she entered the United States with a valid B1/B2 visa with the intent to ask for asylum at the Atlanta immigration office, and she did not realize that she had to ask for asylum at the airport. Angodo claimed that she did not realize that it was fraudulent initially to state that she was here to visit if she intended to ask for asylum.

C. State Department Country Report

The 2002 State Department Country Report on Human Rights Practices in Cote d'Ivoire listed the FPI as the "ruling" or "governing" party during the time relevant to this case. Id. at 230, 233, 241-43, 249-50. The report stated that the FPI candidate was elected president in October 2000, which caused violence and unrest between members of the FPI and the RDR. It described how, in September 2002, exiled military members and RDR members started uprisings primarily in the north, where RDR members are concentrated, but also in Abidjan (where Angodo lived). That same year, clashes between FPI and RDR members resulted in many deaths on both sides. The report also stated that there is a great deal of domestic violence and other abuse against women, and observed that there is a "severe social stigma" attached to victims of such abuse in Cote d'Ivoire, that victims of rape and other abuse are "often" ignored by the authorities, and that the

6

government does not keep statistics on "rape or other physical abuse of women." Id. at 251.

D. Asylum Hearing

At the asylum hearing, Angodo explained that she had not told the first INS officer she spoke with at the airport that she intended to ask for asylum and not merely to visit because she did not know that she had to ask for asylum at the airport. She then responded to questions about her connection with the FPI, explaining that her work had been "to help young women to learn about politics and to be involved in politics." Id. at 126. She again described her involvement in the October 2000 march supporting the newly elected president, this time stating that she and three other women were offered a ride home from the march by four men in "army clothes." Id. at 128. Angodo stated that she and the other women "squeez[ed] inside" the car with the men, who then took the women to a park and raped them. Id. She first testified that she did not know how she returned home after the incident, but she later said that she took a taxi home. Angodo explained that she could not tell her husband or the police because "[t]hey don't care about this kind of allegation." Id. at 130. She testified that at the time of that first rape she did not know for certain who the men were, but later realized that they were rebels when her husband was kidnaped. Angodo testified that she was in the

7

United States when the war broke out on 19 September 2002, but that she returned to Cote d'Ivoire. She explained that she did not ask for asylum on this trip, or on her previous trip to the United States made after that rape, because "you cannot just ask for asylum when you don't have any problem [in your country]." Id. at 134.

Angodo, who had a two-year degree in accounting and owned a retail business in Cote d'Ivoire, testified that at the end of September or early in October 2002, "people from the RDR and some other people that steal" broke into her store and took everything. Id. at 159. She testified that her home was also ransacked in October of 2002, but that nothing was stolen. She said that other homes were broken into at the same time hers was vandalized. She testified that the same thing happened in November 2002 after she and her husband had moved to a new neighborhood, which made them believe that it was "people from the opposition." Id. at 137. So, they moved to yet another neighborhood.

Then, in December 2002, "four men came again dressed in uniform." Id. at 138. She testified that when she came out of the bedroom to see who was there, she saw her husband tied up. She explained that, because the men then began beating her, tearing her clothes, and raping her, she did not know if they said anything to her and had been unable "to really see what kind of uniform they [were] wearing." Id. at 139, 141. She said that the men kidnaped her husband, but

8

that she did not call anyone and could not leave the house to find help "because of the curfew." Id. at 141. The next day she went to the police station to see if her husband was there, but she did not tell them that she was beaten or raped because "when they rape you, . . . nobody look[s] at you as a woman anymore. They don't respect you anymore." Id. at 142. Angodo stated on cross examination that she did not mention the rapes before filling out the asylum application because she did not "like to talk about [her being raped]. That [was her] secret." Id. at 165-66. She further explained that she only told her lawyer about the rapes and beating once she trusted her, because her lawyer was a woman and would therefore understand the effect of it, and because she did not "want anyone [else] to know about it." Id. at 166-67, 168. She also explained that she had not brought her sister to the hearing because she did not want her sister to hear about the rapes, even though she was told that her sister did not have to listen. She said that she had no idea why the men came to her house that day.

Angodo testified that after the rape and kidnaping, she stayed with a friend until she left for the United States. She explained that she could not leave until the end of January because, even though she owned a business which occasionally required her to travel to the United States, she did not at that time have money for a plane ticket because she sent all her money to her sister in the United States for

9

safekeeping "because of the problem in [Cote d'Ivoire]." Id. at 144. Angodo testified that she did not call her sister about buying a ticket, but instead gave her friend a letter to give to someone at the airport to take to her sister. She said that the person at the airport brought back money from her sister and gave it to her friend who bought her plane ticket for her. Angodo explained that she did not simply call her sister in the United States from her cell phone because it was too expensive for it to occur to anyone in Cote d'Ivoire to call overseas by cell phone, and that she had sent the letter to her sister through her friend's friend without saying where she was because she did not know the messenger well enough to be comfortable with his knowing where she was. Id. at 174, 183.

She testified that her son had not been living with her but went "to a Christian school in another town" because she "was scared . . . to keep him with [her and her husband]." Id. at 136. She claimed that she left her son in school in Cote d'Ivoire for his safety because the men were only after her and that she had not told him she was going to the United States because she did not want him to think she was abandoning him. Id. at 155, 172. She said she could not return because people were after her and knew who she was, but she did not know who they were or what they wanted. At least twice in the course of the hearing, the IJ

10

asked Angodo to calm down, not to scream, and simply and directly to answer the questions asked. See id. at 121, 167.

The IJ denied Angodo's applications for asylum, withholding of removal, and CAT relief. He found that Angodo had made a material misrepresentation to gain entry into the United States by telling the INS officers that she only intended to visit when she actually intended to remain permanently. He found that it could be inferred from the situation that she wished to give birth in the United States. The IJ also made an adverse credibility finding based on inconsistencies in Angodo's testimony and his observation of her demeanor while testifying.

Specifically, the IJ noted that Angodo was a "highly educated," literate, "intelligent woman." Id. at 87, 101. Accordingly, he found that the following inconsistencies and explanations in her testimony did not seem credible based on her level of education and understanding: (1) she stated in her asylum application that members of the RDR raped her, but at the hearing she said she did not know who the men were or if they were rebels; (2) she did not request asylum after the 2000 assault despite visiting the United States twice thereafter; (3) in her application, she stated that all the attacks occurred because she was Christian or a member of the FPI, but at the hearing she claimed not to know who her attackers were, why they attacked her, or why they took her husband; (4) although the

11

second group of attackers was in her home for between half an hour and an hour, she could not say whether they wore the same uniforms as the individuals who raped her in 2000; (5) she claimed to be a prominent member in what was the ruling party, but never asked for or received help from the police or other authorities; (6) she alleged that she was the victim of a horrible attack in which her husband was taken, but she did not call her sister from her cell phone because it was too expensive; and (7) she had owned a business and traveled to the United States numerous times, and yet used an overly circuitous process to get a plane ticket for this trip. The IJ also did not find it credible that Angodo would not mention her beating or her husband's kidnaping when she asked for asylum at the airport, instead only stating that she did not want to return to Cote d'Ivoire because the country was in civil war. Further, the IJ did not find it credible that she would leave her son alone if her husband had been kidnaped. Finally, he pointed to her angry and frequently nonresponsive or evasive demeanor during the hearing.

The IJ determined that Angodo had not articulated any reason why she would be harmed upon her return to Cote d'Ivoire, and that any fear on her part was derived from general country conditions. The IJ also found that Angodo had shown no nexus between her alleged persecution and any of the five grounds justifying asylum. Because Angodo failed to carry the burden of proof for asylum,

12

the IJ also concluded that she could not establish the higher burden necessary for withholding of removal. He denied CAT relief because Angodo had shown no evidence that the Ivoirian government would mistreat her.

Angodo appealed, essentially reasserting her prior claims and arguing that the IJ's findings regarding her credibility were based on immaterial or nonexistent inconsistencies. The BIA affirmed and adopted the IJ's decision, briefly stating that the IJ's adverse credibility finding was based on material inconsistencies in Angodo's sworn statements that were "central to the claim and were actually present in the record." Id. at 2. The BIA found that Angodo did not present "a convincing explanation for the discrepancies and omissions." Id.

In her petition for review, Angodo argues that the IJ erred in denying her petition and in making an adverse credibility determination because she met her burden of proof for asylum by showing that she was a Christian member of the FPI who had been raped twice and had her husband kidnaped by members of the RDR. Specifically, Angodo again argues that the IJ's findings of fraud and credibility were based on immaterial differences between her sworn testimony and the airport interview and, alternatively, that the IJ erred by rejecting her testimony without articulating any reason. She contends that she has made a showing of past persecution and need not prove the subjective prong of well-founded fear

13

necessary for withholding of removal. Further, Angodo maintains that an adverse credibility determination should not automatically defeat her CAT claim. Finally, she argues that she did not receive a full and fair hearing because the IJ improperly assumed that her pregnancy at the time of her entry into the United States meant that she fraudulently intended to stay.

## II. DISCUSSION

When the BIA issues a decision, we review only that decision, "except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review the IJ's opinion in this case because the BIA has adopted it in full. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004). In so doing, we review legal determinations by the IJ de novo. Id. at 817. We examine factual findings, including determinations of credibility, however, under the substantial evidence test. Id. at 817-18. Under this test, we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. at 818 (citation omitted). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). That evidence in the "record may support a contrary

conclusion is not enough to justify a reversal." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004), cert. denied, __ U.S. __, 125 S. Ct. 2245 (2005).

A. Asylum and Adverse Credibility

An alien who arrives in or is present in the United States "may apply for asylum." 8 U.S.C. § 1158(a)(1). To qualify for asylum, the alien must be a "refugee." Id. § 1158(b)(1)(A). A "refugee" is any person who is unwilling to return to her home country or to avail herself of that country's protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). The asylum applicant "bears the burden of proving such statutory "refugee" status. Al Najjar, 257 F.3d at 1284 (citing 8 C.F.R. § 208.13(a)). An applicant satisfies this burden by showing, with specific and credible evidence: (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that her statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. "Demonstrating such a connection requires the alien to present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of . . . an opinion [or other statutory factor]." Al Najjar, 257 F.3d at 1287 (quotations and citation omitted). An applicant must show not only that she has a political opinion or

15

religious or social affiliation, but that she was persecuted because of it. <u>INS v. Elias-Zacarias</u>, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). We have clarified that "the INA does not extend eligibility for asylum to anyone who fears the general danger that inevitably accompanies political ferment and factional strife." <u>Mazariegos v. Office of U.S. Att'y Gen.</u>, 241 F.3d 1320, 1328 (11th Cir. 2001) (quotations omitted); <u>see</u> <u>also</u> <u>Singh v. INS</u>, 134 F.3d 962, 967 (9th Cir. 1998) ("Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum to everyone who wishes to improve his or her life by moving to the United States .").

To establish a "well-founded fear," "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." <u>Al Najjar</u>, 257 F.3d at 1289. A "well-founded fear" of persecution may be established based on (1) past persecution on account of race, religion, nationality, social group membership, or political opinion that creates a presumption of a "well-founded fear" when not rebutted by the INS; (2) a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country; or (3) a pattern or practice in the subject country of persecuting members of a statutorily

16

defined group of which the applicant is a member.  See 8 C.F.R. § 208.13(b)(1),

(2).

"The testimony of the applicant, if credible, may be sufficient to sustain the

burden of proof without corroboration."  Id. §§ 208.13(a), 208.16(b).  On the other

hand, "an adverse credibility determination alone may be sufficient to support the

denial of an asylum application."  Forgue v. U.S. Att'y. Gen., 401 F.3d 1282, 1287

(11th Cir. 2005).  "The weaker an applicant's testimony . . . the greater the need for

corroborative evidence."  Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir.

2005).  In making an adverse credibility determination, however, an IJ must offer

"specific, cogent reasons."  Forgue, 401 F.3d at 1287.  "[M]inor inconsistencies

and minor admissions that 'reveal nothing about an asylum applicant's fear for his

safety are not an adequate basis for an adverse credibility finding.'"  Gao v.

Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002); see also Chebchoub v. INS, 257 F.3d

1038, 1043 (9th Cir. 2001).  Further, "an adverse credibility determination does not

alleviate the IJ's duty to consider other evidence produced by an asylum applicant."

Forgue, 401 F.3d at 1287.  Nevertheless, when the IJ enumerates an applicant's

inconsistencies and is supported by the record, "we will not substitute our

judgment for that of the IJ with respect to its credibility findings."  D-Muhumed,

388 F.3d at 819.

Here, the IJ made an adverse credibility finding based on inconsistencies between Angodo's testimony before the IJ and the statements regarding her reasons for claiming asylum at the airport interview, at her asylum interview, and in her asylum application. Although certain of the inconsistencies pointed out by the IJ are adequately explained by Angodo's responses and the record as a whole, several inconsistencies central to the case are not, such that the adverse credibility determination is substantially supported by the record. First, during the airport interview, Angodo only mentioned fears of the civil war and security problems in Cote d'Ivoire, which do not alone warrant asylum. She added claims of specific instances of persecution, such as the kidnaping of her husband and her two rapes, only in her later statements. Second, she did state that her husband supported the president in her asylum interview, when she first discussed his kidnaping, but she did not mention either his or her membership in the FPI until she filed the asylum application, and she gave inconsistent responses about her knowledge of the identity of the assailants in the two incidents – initially claiming that they were rebels and then, at the hearing, saying she had no idea who they were or why they came to her house in particular. Third, there is inconsistency in the details she gives surrounding the first rape, particularly in terms of how she ended up in the car with the assailants, which bears on whether she knew who they were. Finally,

18

the IJ based his credibility determination not only on Angodo's inconsistent statements, but also on his observation of her belligerent demeanor and non-responsive or evasive behavior at the hearing.

Since the IJ has articulated several reasons that are supported by the record for doubting Angodo's credibility, we find he did not make any improper determination based solely on Angodo's pregnancy at the time of her arrival. In light of the IJ's express concerns about the credibility of Angodo's testimony as to key elements of her claim and Angodo's failure to rebut these with sufficient corroborating evidence or explanation, it cannot be said that the evidence compels us to reverse the finding. See Elias-Zacarias, 502 U.S. at 481 n.1, 112 S. Ct. at 815 n.1.

Even if the adverse credibility finding were not supported by substantial evidence, substantial evidence supports the IJ's finding that Angodo failed to establish the existence of past persecution or a well-founded fear of future persecution on account of her political opinion or religious affiliation. See id. Even if the rapes and her husband's kidnaping occurred, Angodo has not shown that the perpetrators were persecuting her because of her political opinion or religious affiliation. She testified that she does not know for certain who the perpetrators of either rape were, why they attacked her, or whether they actually

19

belonged to a group that opposed her religion or political party membership. Angodo is consistent in her fear of the current conditions in Cote d'Ivoire, but such a general fear is not enough to show a fear of individual persecution. See Mazariegos, 241 F.3d at 1328. Accordingly, we find that the IJ's determination that Angodo failed to meet the standard for asylum is supported by substantial evidence.

B. Withholding of Removal

An alien shall not be removed to a country if her "life or freedom would be threatened in that country because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The standard for withholding of removal, however, is more stringent than the well-founded fear standard for asylum; thus, if an applicant is unable to meet the well-founded fear standard for asylum, she is generally unable to qualify for withholding of removal or deportation. See Al Najjar, 257 F.3d at 1292-93. Such is the case for Angodo.

C. CAT Relief

An applicant for relief under CAT must establish that it is more likely than not that she would be tortured if returned to the proposed country of removal. Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004). The

20

burden of proof for an applicant seeking withholding of removal under the CAT, like the burden for an applicant seeking withholding of removal under the INA, is higher than the burden for showing entitlement to asylum. Al Najjar, 257 F.3d at 1303-04. Thus, because Angodo has failed to demonstrate past persecution based on a statutorily protected factor or a well-founded fear of such persecution, she also fails to meet the standard for relief under CAT.

### III. CONCLUSION

Angodo petitions for review of the final order of the BIA, which adopted the decision of the IJ, ordering her removal, and denying asylum and withholding of removal under the INA and CAT. The IJ determined that Angodo had failed credibly to demonstrate that she had been previously persecuted based on a statutorily protected factor or had a well-founded fear of such persecution upon her return to Cote d'Ivoire. Because there is substantial evidence to support the IJ's determination that Angodo was not credible and failed to establish a well-founded fear of persecution or any nexus between her alleged attackers' actions toward her and her husband and her religion or political opinions, she is ineligible for asylum and cannot establish entitlement to withholding of removal under the INA or CAT. The petition is **DENIED.**