**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NARENDRA KUMAR; RINA WATI
SHARMA KUMAR; SHEKHAR KAUSHIK
KUMAR,
                    *Petitioners,*

            v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 03-70200

Agency Nos.
A73-419-830
A73-419-831
A73-419-833

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
July 15, 2005—San Francisco, California

Filed February 15, 2006

Before: Barry G. Silverman, Kim McLane Wardlaw, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Wardlaw

1705

**COUNSEL**

Robert L. Lewis and Courtney McDermid, Law Office of Robert L. Lewis, Oakland, California, for Petitioners Narendra, Rina, and Shekhar Kumar.

Donald A. Couvillon, Department of Justice Office of Immigration Litigation, Washington, D.C., for Respondent Alberto R. Gonzales, Attorney General.

**OPINION**

SILVERMAN, Circuit Judge:

8 C.F.R. § 1003.1(e)(4)(ii) prescribes the exact language that the BIA must use when it issues a "streamlined affirmance", *i.e.*, affirms an immigration judge's decision without opinion. In this case, the BIA employed the prescribed language but also added a footnote disavowing the IJ's adverse credibility finding. We hold today that although the footnote violated the BIA's regulations, its inclusion was nothing more than harmless surplusage and caused no prejudice. We therefore assume the Kumars are credible and review the IJ's deci-

sion directly. Doing so, we hold that substantial evidence supports the IJ's decision that the petitioners did not establish past persecution or a likelihood of future persecution.

## FACTS AND PROCEEDINGS BELOW

Narendra Kumar is an ethnic Indian and a native and citizen of Fiji. His wife, Rina Kumar, and their son, Shekhar Kumar, are also natives and citizens of Fiji. On November 10, 1994, the Kumars entered the United States on visitor-for-pleasure visas that permitted them to stay in the United States until May 1995. The Kumars failed to leave the United States by the specified date. The INS issued a Notice to Appear charging the Kumars with removability pursuant to § 237(a)(1)(B) of the Immigration and Nationality Act by reason of having overstayed their visas without authorization. At a hearing before an IJ, the Kumars admitted the factual allegations set forth in the Notice to Appear and conceded removability. The Kumars elected to seek asylum and filed Mr. Kumar's lead application; Rina and Shekhar Kumar's claims are derivative of Mr. Kumar's application.

The Kumars testified about three incidents in support of their claim for asylum.

(1)    1987 Incident at the Kumars' Home

Mr. Kumar testified that he is an ethnic Indian who had been active in the fledgling Labor Party in Fiji around the time of a military coup to take over the government in 1987. Approximately two weeks following the coup, three soldiers in uniform came to the Kumars' house purportedly looking for guns. During the incident, Mr. Kumar was punched in the stomach and around the face and verbally abused. He testified that he still has bruises from the incident. One of the soldiers grabbed and squeezed Mrs. Kumar. The soldier additionally made a loud comment in Fijian, which neither Mr. nor Mrs. Kumar understood, but which caused the other soldiers to

laugh. After the soldiers left, the Kumars discovered that some of Mrs. Kumar's jewelry was missing.

Mr. Kumar initially described this incident as occurring sometime between 10:00 a.m. and noon. When pressed during cross-examination, Mr. Kumar changed his testimony to be consistent with his asylum application — that the incident occurred in the evening. He explained that he was mistaken in his earlier testimony.

Mr. Kumar testified that the next day he filed a complaint with the police. As a result of reporting the incident, the police took Mr. Kumar into custody and locked him in a cell overnight. While in custody, a policeman verbally threatened Mr. Kumar and hit his head against the wall.

Shortly after this incident, Mr. Kumar moved to New Zealand where he remained for about two years. He obtained a work visa allowing him to work legally in New Zealand, and found employment at a warehouse. Mrs. Kumar and the children stayed behind in Fiji with Mrs. Kumar's family. Mr. Kumar testified that he was concerned about his family's safety, but felt they would be safe living with his in-laws. In 1989, Mr. Kumar voluntarily returned to Fiji because he felt that the situation had improved and he "was feeling lonely" in New Zealand. When he returned from New Zealand, he no longer had any involvement with the Labor Party.

(2)   1991 Incident at Mr. Kumar's Temple

Mr. Kumar testified that he is Hindu. Sometime in 1991, two soldiers arrived at the temple where he was praying. They took him outside and told him that Hindus are not allowed to practice their religion in Fiji and that he should convert to Christianity or go back to India. The soldiers did not arrest or physically abuse Mr. Kumar. After this incident, Mr. Kumar stopped going to the temple.

(3)   1994 Car Collision

In August of 1994, Mr. Kumar was involved in a car colli-
sion. He testified that he was driving through an intersection
with a four-way stop and an army truck failed to stop at the
intersection and hit the back of his car. When he confronted
the soldiers and told them that they could have killed him, one
of the soldiers responded that Mr. Kumar's life was not worth
living in Fiji and that he should return to India. Then the sol-
dier kicked Mr. Kumar and his car. Mr. Kumar testified that
the soldiers intentionally ran into his car because he was a
member of the Labor Party. On cross-examination, Mr.
Kumar was asked how the soldiers would have known that he
was the driver of the car that they hit. He responded that they
could have recognized his car from the rallies he attended in
1987.

Mr. Kumar did not report the incident because an Indo-
Fijian police officer advised him that it would only cause him
more trouble. Following this incident, the Kumars decided to
come to the United States to escape the harassment and to
"make money" and have a "better life here."

Mr. Kumar testified that he has three brothers and two sis-
ters residing in Fiji. They are all Indo-Fijians. He stated that
his brothers and sisters lease the land they live on from Fijian
landowners and have been told that the leases will not be
renewed. In addition, he testified that his elder brother was the
victim of multiple burglaries. Mrs. Kumar testified that her
parents and one brother live in the United States. One sister
lives in Australia and one sister lives in Canada.

At the conclusion of the asylum hearing, the IJ rendered her
decision. She found that Mr. Kumar was not credible because
of numerous inconsistencies and contradictions between his
written declaration and the oral testimony presented at the
hearing. The IJ further ruled that even assuming Mr. Kumar
were credible, he failed to submit sufficient evidence of past

persecution or a well-founded fear of future persecution if he and his family returned to Fiji. Finally, the IJ found that Mr. Kumar failed to present any evidence that he is likely to be tortured if he returned to Fiji. The IJ granted the Kumars' application for voluntary departure.

The Kumars appealed to the BIA, which issued the following decision:

> The Board affirms, without opinion, the result of the decision below.[fn/1] The decision below is, therefore, the final agency determination. *See* 8 C.F.R. § 3.1(e)(4).
>
> > [fn/1] The Board does not summarily affirm the Immigration Judge's adverse credibility determination. However, this does not affect our decision to affirm the Immigration Judge's ultimate decision denying relief.

The Kumars timely petition for review.

## ANALYSIS

### A.   BIA's Summary Affirmance

The Kumars challenge the BIA's summary affirmance procedure as applied in this case. Specifically, they contend that the BIA violated its own regulations when it added a footnote carving the IJ's credibility decision out of its review.

The BIA's authority to affirm cases without opinion is codified at 8 C.F.R. § 1003.1(e)(4).[1] In particular, § 1003.1(e)(4)(ii) states:

---

[1] The regulations now at 8 C.F.R. Part 1003 (2003) formerly were at 8 C.F.R. Part 3 (2002).

If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. See 8 CFR 1003.1(e)(4)." An order affirming without opinion, issued under authority of this provision, shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the immigration judge or the Service were harmless or nonmaterial.

[1] Here the BIA failed to strictly follow the procedure outlined above. The order recites the prescribed text set forth in § 1003.1(e)(4)(ii), but also includes a footnote disavowing the IJ's adverse credibility finding. The inclusion of that footnote is contrary to the regulation.

[2] The violation of an agency regulation does not necessarily render a deportation unlawful. *See United States v. Calderon-Medina*, 591 F.2d 529, 531-32 (9th Cir. 1979). Rather, a petitioner must demonstrate that the violation prejudiced those interests protected by the regulation. *Id.* While we are dubious as to whether the particular regulation at issue creates any protectible right, we need not resolve that issue here. As conceded by the Kumars' counsel at oral argument, the Kumars did not and cannot show that they were prejudiced by the footnote or that the violation of the regulation affected the outcome of the proceedings. *See Hernandez-Luis v. INS*, 869 F.2d 496, 498 (9th Cir. 1989).

[3] At worst, the inclusion of the footnote was harmless surplusage. At best, the Kumars benefitted from the BIA's error. We assume, as the IJ did in her alternative ruling, that the Kumars are credible. We conclude that the Kumars did

not suffer prejudice as a result of the BIA's failure to strictly adhere to its regulations.[2]

The Kumars' remaining contentions regarding streamlining are foreclosed by our decision in *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 848, 851 (9th Cir. 2003), where we held that "streamlining does not violate an alien's due process rights . . . . Nor is it a due process violation for the BIA to affirm the IJ's decision without issuing an opinion."

## B.   Persecution in Fiji

**[4]** To establish eligibility for asylum, an applicant must demonstrate that he is a "refugee," *i.e.*, an alien who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 (9th Cir. 2003). To give rise to refugee status, the persecution must be "on account of" one of the five statutorily-specified grounds. *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001). The IJ found that Mr. Kumar's experiences in Fiji did not rise to the level of persecution. We agree; substantial evidence supports the IJ's conclusion that the Kumars failed to establish past persecution on account of any of the five statutorily-specified grounds. *See Elias-Zacarias v. INS*, 502 U.S. 478, 481 (1992).

Following the incident at the Kumars' home in 1987, Mr. Kumar left Fiji and lived in New Zealand for approximately two years. He then voluntarily returned to Fiji because he was lonely and depressed in New Zealand. The IJ stated that Mr. Kumar's voluntary return to Fiji was indicative of Kumar's own belief that it would be safe and appropriate for him to

---

[2]Furthermore, there is nothing to be gained by remanding the case to the BIA so that it can excise the footnote and send the case back to us without it.

live in Fiji. In addition, following his return to Fiji in 1989, Mr. Kumar no longer had any association with the Labor Party. To the extent that the Fijian military targeted Mr. Kumar in 1987 because of his activities with the Labor Party, as Mr. Kumar testified, his two-year absence from the country and distance from the party upon his return weaken his claim of persecution.

The IJ found that the 1994 incident was a traffic accident and was not related to any of the five statutory grounds for asylum. Moreover, the IJ concluded that the accident was brief and did not result in any serious problems with the military. The Kumars presented no evidence to the contrary. Finally, the IJ noted that the Kumars both testified that practicing their religion at home is "comfortable, acceptable, and routine to them." The single incident in 1991 at Mr. Kumar's temple is not sufficient to establish that the Kumars suffered religious persecution in Fiji. Even considering the cumulative effect of the Kumars' experiences, this case is not one in which the evidence presented compels a finding contrary to that of the IJ.[3]

---

[3]*Compare with Prasad v. INS*, 47 F.3d 336, 339-340 (9th Cir. 1995) (concluding that an attack committed by a group of ethnic Fijians and the military, detention by the police, physical abuse while in police custody, and coercive questioning by the police regarding political affiliations were insufficient to establish past persecution); *Singh v. INS*, 134 F.3d 962, 968-69 (9th Cir. 1998) (holding that an Indo-Fijian's claims of ethnic tension, including the stoning of her house by ethnic Fijians, burglary of her home and property, governmental outlawing of Hindu, and refusal of police assistance, did not compel a finding of persecution). We have defined persecution as "an extreme concept that does not include every sort of treatment our society regards as offensive." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) (citation omitted) (internal quotation marks omitted). "Discrimination on the basis of race or religion, as morally rephrensive as it may be, does not ordinarily amount to persecution within the meaning of the Act." *Id.* To obtain reversal of an IJ's decision, a petitioner must show that the evidence not only supports reversal, but compels it. *Elias-Zacarias*, 502 U.S. at 481 n.1. While the ethnic slurs and physical confrontations the Kumars endured are regrettable, the evidence presented here does not compel reversal.

**[5]** Mr. Kumar's testimony also fails to establish a well-founded fear of future persecution. *See Meza-Manay v. INS*, 139 F.3d 759, 763 (9th Cir. 1998) (stating that to establish a well-founded fear of future persecution, the alien must demonstrate both an objectively reasonable and subjectively genuine fear of persecution).

**[6]** Because the Kumars have not established eligibility for asylum, they have not met the higher burden of proving that they are entitled to withholding of removal. *See Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc) (holding that an applicant who has not satisfied the lesser standard of proof required to establish eligibility for asylum necessarily fails to satisfy the more stringent standard required to establish eligibility for withholding of removal).

### CONCLUSION

The Kumars' petition for review is denied. The stay of removal pending review will expire upon issuance of the mandate in this case. *See Desta v. Ashcroft*, 365 F.3d 741, 750 (9th Cir. 2004).

**PETITION DENIED.**

---

WARDLAW, Circuit Judge, Dissenting:

I respectfully dissent. Our precedent precludes the majority from treating this petition as we would have had the BIA affirmed without opinion. The BIA's error in failing to comply with its own regulations is not harmless and did cause prejudice. The most egregious prejudice is that when the BIA disregarded its regulations, choosing instead to dispose of this petition through its summary affirmance procedures, Kumar was denied the full review at the agency level to which he is entitled. This error should be remedied by a remand to the

BIA for a determination whether, taking Kumar's testimony as true, the Kumars established past persecution. Instead, the majority continues down the BIA's misguided path by again denying Kumar the full review to which he is entitled.

The majority disregards governing case law that dictates the procedure we must follow when reviewing a BIA decision affirming the IJ without opinion. Where the BIA affirms the IJ without opinion, the panel is to review the IJ decision as the final agency decision. *Singh v. Gonzales*, 412 F.3d 1117, 1121 n.6 (9th Cir. 2005); *see also Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003). The majority purports to undertake this review. What it actually does, however, is review the IJ's ultimate rejection of the Kumars' asylum claim while rejecting the IJ's adverse credibility finding—an unprecedented process that flouts the rules governing BIA streamlining. The majority's solution to the regulatory anomaly that the BIA created is to review both the IJ and BIA opinions, accepting the BIA's credibility determination (presumably as supported by substantial evidence) and then reviewing the IJ's opinion through that lens.

The majority further muddles the process required when an adverse credibility finding is rejected. Under *INS v. Ventura*, 537 U.S. 12 (2002), if the panel rejects the IJ's adverse credibility finding, which the majority does here, the proper course is to remand to the BIA for further proceedings, accepting the petitioner's testimony as true. *See, e.g.*, *Ding v. Ashcroft*, 387 F.3d 1131, 1140 (9th Cir. 2004); *Singh v. Ashcroft*, 362 F.3d 1164, 1172 (9th Cir. 2004). Instead, the majority usurps the role of factfinder by "reviewing" the IJ decision, taking Kumar's testimony as true, thus affirming the BIA's decision instead of remanding.

Even setting aside the majority's failure to follow the procedure for appellate review of streamlined cases, the BIA's decision to streamline Kumar's petition in the first place was prejudicial error. Affirmance without opinion—the process

under which a single Board member, rather than a three-member panel, reviews an IJ decision, and issues a standard three-sentence opinion (the language of which is mandated by statute), rather than one tailored to the petition—is appropriate if three requirements are met. The BIA member to whom the case is assigned must (1) affirm the result of the IJ's decision; (2) determine that any errors in the IJ's decision were "harmless or nonmaterial"; and (3) determine that (a) the issues on appeal are controlled by precedent and do not require application of precedent to a novel fact situation, or (b) the factual and legal issues on appeal are "not so substantial that the case warrants the issuance of a written opinion." 8 C.F.R. § 1003.1(e)(4)(i). Although the BIA indeed affirmed the result of the IJ's decision, its footnote refusing to affirm the IJ's credibility determination makes clear that the Board member reviewing the case determined that the IJ's erroneous adverse credibility finding was not in fact "harmless or non-material," as is required. If the adverse credibility finding was truly harmless or nonmaterial error, it would have been unnecessary to note disagreement with it.

Nor did this petition raise the kind of "not so substantial" factual and legal questions appropriate for review and disposition by a single member of the BIA. Rather, this petition presents "a decision by an immigration judge . . . that is not in conformity with the law or with applicable precedents," which makes it appropriate for review by a three-member panel of the Board. *Id.* § 1003.1(e)(6)(iii). Had it been given the greater consideration of a three-member panel, the BIA might have actually read the record and caught the mischaracterization of Kumar's testimony by the IJ contained within the so-called alternative ruling. Relegating this case to review by a single Board member, without the opportunity to explain the decision in an opinion, denied Kumar the right to the full and fair hearing required by the Fifth Amendment Due Process Clause.

The prejudice caused by the BIA is exacerbated in a petition such as Kumar's, where the law and the facts are not clear. This is a very close case, both legally and factually. We have articulated varying legal standards on the degree of individualized persecution a petitioner must show to merit relief. *Compare Avetova-Elisseva v. INS*, 213 F.3d 1192, 1196 (9th Cir. 2000) (finding that "[f]or a sustainable showing of past persecution, a '[p]etitioner must establish that the mistreatment she suffered . . . was substantially more grievous in kind or degree than the general manifestation of hostility between . . . competing ethnic and religious groups' " (second alteration in original) (quoting *Singh v. INS*, 134 F.3d 962, 967 (9th Cir. 1998)), *with Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004) (holding that, in contrast to the proof required to show a well-founded fear of future persecution, "proof of particularized persecution is not required to establish past persecution").[1]

The cumulative effect of several incidents may constitute persecution, even if no single incident would itself rise to the level of persecution. In *Chand v. INS*, we stated, "When considering an asylum claim, we consider cumulatively the harm an applicant has suffered. An applicant may suffer persecution because of the cumulative effect of several incidents, no one of which rises to the level of persecution." 222 F.3d 1066, 1074 (9th Cir. 2000) (finding persecution where Indo-Fijian was physically abused by Fijian soldiers, robbed multiple times, received no police assistance, and endured other crimes such as burglary); *see also Narayan v. Ashcroft*, 384 F.3d 1065, 1068 (9th Cir. 2004) (holding violence due to the 1987 military coup, the denial of medical treatment, repeated burglaries of the petitioner's home, denial of police assistance,

---

[1]*Mgoian v. INS* also notes that "if the applicant is a member of a 'disfavored' group, but the group is not subject to systematic persecution, [we] will look to (1) the risk level of membership in the group (i.e., the extent and severity of persecution suffered by the group) and (2) the alien's individual risk level." 184 F.3d 1029, 1035 n.4 (9th Cir. 1999).

and other physical violence compelled a finding of persecution against an Indo-Fijian petitioner); *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir. 1996) (finding persecution where Indo-Fijian member of the Labour Party was jailed twice for multiple days, beaten, and subjected to sadistic and degrading treatment); *Surita v. INS*, 95 F.3d 814, 819-21 (9th Cir. 1996) (finding persecution where Indo-Fijian's claims of being robbed ten to fifteen times by ethnic Fijians, who targeted her because she was Indo-Fijian, were supported by evidence that the government was unable or unwilling to control such crime).

On the other hand, given the deference afforded the IJ's decision, we have at times strictly interpreted what "necessarily constitute[s] persecution," as the question is defined in *INS v. Elias-Zacarias*, 502 U.S. 478, 479 (1992). *See, e.g.*, *Prasad v. INS*, 47 F.3d 336, 339-40 (9th Cir. 1995) (holding that, in the case of an Indo-Fijian member of the Labor party who was forced from a vehicle at gunpoint, jailed, hit, kicked, and coercively questioned and threatened about political affiliations, a factfinder *could* have found persecution but was *not compelled* to do so); *see also Lata v. INS*, 204 F.3d 1241, 1245 (9th Cir. 2000) (finding assaults, burglarizing of the petitioner's home, and other vandalism by ethnic Fijians constituted "isolated criminal incident[s]" and did not compel a finding of persecution); *Singh*, 134 F.3d at 968-69 (holding that an Indo-Fijian's generalized claims of ethnic tension, burglarizing of petitioner's home, governmental outlawing of Hindu religious gatherings, and refusal of police assistance did not compel a finding of persecution).

Because the precise standards for judging persecution have varied, the IJ's credibility determination was all the more critical—and the record demonstrates that it must have tainted the IJ's view of the facts as set forth in the "alternative" holding, understandable human behavior, for there is no explanation other than outright dissembling for the IJ's deliberate mischaracterization of Kumar's testimony. For example, the

IJ extrapolates from Kumar's return to Fiji the factual finding that Kumar believed it would be "safe and appropriate" for him to return. In fact, Kumar's testimony, which now must be deemed truthful, was that he returned because "[his] wife cal-led[:] she said the situation was improving so—and decided that [he] didn't have any relatives there so [he] was feeling lonely and depressed and [he] had to come back." The IJ accepts as a fact that while Kumar was worshiping at temple, he was dragged out by two soldiers who told him (1) that he could not practice his religion in Fiji and (2) to get out of Fiji. This is plainly persecution, but the IJ concludes that because Kumar has worshiped at home since the time of that incident and now goes to temple only a few times a year, the religious persecution he suffered has somehow vanished. The IJ incor-rectly finds that the Kumars believe worshiping at home is "comfortable, acceptable, and routine to them." In fact, Kumar merely testified that it was acceptable in the Hindu religion to practice at home. He never testified that worship-ing at home was an acceptable alternative to him; rather, he said his wife stopped him from going to temple. The obvious inference from this testimony is that Kumar wanted to go to temple, but his wife felt it was dangerous to practice his reli-gion openly in Fiji. That the Kumars continue to practice at home, moreover, cannot be taken to mitigate the impact of the religious persecution they did suffer in Fiji. Indeed, Rina Kumar testified that the reason that they had attended temple more often in Fiji, prior to the incident, was that there was more activity as a result of the large Indian community there. Thus, as support for the "alternative" holding, the IJ miscon-strued the Kumars' less frequent attendance in the United States, explainable perhaps because the Indian or Hindu com-munity is less active here, as evidence that the Kumars were not affected by the incident at the temple.

These and other errors the IJ made in allowing its disbelief of Kumar to infect her characterization of the Kumars' testi-mony demonstrate the grave consequences flowing from the majority's decision to pretend that the IJ's holding on the

merits was unaffected by its erroneous adverse credibility finding. When the IJ made her ruling on persecution, she could not help but do so from a perspective of skepticism and disbelief. The majority accepts the IJ's misstatement of the facts and her unsupported inferences even though the record shows they are wrong. Given the complexities of our law on persecution, and the importance of particular facts to a decision on persecution, the majority's decision to accept the IJ's version of the facts is especially damaging.

We are, of course, not in the best position to now weigh the testimony presented, as it is not our responsibility to make factual determinations about petitioner's allegations in the first instance. Where the IJ makes an erroneous adverse credibility determination, the IJ should be charged with reviewing Kumar's claim, taking his testimony as true, and free of the taint of the adverse credibility finding that the record demonstrates influenced the IJ's alternative ruling. Because we cannot treat this case as we would had the BIA simply affirmed without opinion, and because we should not place ourselves in the role of factfinder and inquire into the merits of the Kumars' petition, rather than remand to the agency, the majority's resolution is contrary to the holding of *INS v. Ventura*.

I am not quite as certain as the majority is that if this case were remanded, all that the BIA would do is delete the footnote refusing to affirm the adverse credibility finding and issue another summary affirmance. It might just decide to follow its own regulation and give Kumar's petition the full review it deserves, given the IJ's errors. Especially considering the Attorney General's recent statement that the conduct of some immigration judges "can aptly be described as intemperate or even abusive," and his admonition to members of the BIA that each case must "be reviewed proficiently and that each alien be treated with courtesy and respect," Memorandum from Attorney General Alberto Gonzales to Members of the Board of Immigration Appeals (Jan. 9, 2006), I am

inclined to believe that a remand would produce more meaningful review than the majority expects. And even if it did not, failure of the BIA to discharge its duty to review each case proficiently does not relieve us of our duty to follow correct procedure and our own precedent.

Because neither the BIA nor the majority followed the correct procedure and both thereby effectively deprived Kumar of the process to which he was entitled, I dissent.