# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JANNIF ALI,

        *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

        *Respondent.*

No. 07-71195

Agency No.
A070-149-536

---

JANNIF ALI,

        *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

        *Respondent.*

No. 07-73559

Agency No.
A070-149-536

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 17, 2011—San Francisco, California

Filed March 18, 2011

Before: Mary M. Schroeder and Sidney R. Thomas,
Circuit Judges, and Lynn S. Adelman, District Judge.*

Opinion by Judge Thomas

---

*The Honorable Lynn S. Adelman, District Judge for the U.S. District
Court for Eastern Wisconsin, Milwaukee, sitting by designation.

3703

**COUNSEL**

Robert B. Jobe, Law Office of Robert B. Jobe, San Francisco, California, for the petitioner

Gregory G. Katsas, Acting Assistant Attorney General, Civil Division, David V. Bernal, Acting Director, Office of Immigration Litigation, Jeffery R. Leist, Attorney, Office of Immigration Litigation, Washington, D.C., for the respondent.

**OPINION**

THOMAS, Circuit Judge:

Fijian Jannif Ali, a Muslim and ethnic Indian, petitions for review of agency decisions denying his application for asylum, withholding of removal, relief under the Convention Against Torture, and his motion to reopen. We grant the petitions for review.

I

In this case, we revisit the "severe mistreatment that [Indo-Fijians] have suffered in their adopted country." *Gafoor v. INS*, 231 F.3d 645, 647 (9th Cir. 2000), *superseded by statute*, Real ID Act of 2005, Pub. L. No. 109-13, *as recognized in Parussimova v. Mukasey*, 533 F.3d 1128, 1133 (9th Cir. 2008).[1]

---

[1]*See also Sinha v. Holder*, 564 F.3d 1015 (9th Cir. 2009); *Kumar v. Gonzales*, 439 F.3d 520 (9th Cir. 2006); *Narayan v. Ashcroft*, 384 F.3d 1065 (9th Cir. 2004); *Faruk v. Ashcroft*, 378 F.3d 940 (9th Cir. 2004); *Lal v. INS*, 255 F.3d 998 (9th Cir. 2001); *Tagaga v. INS*, 228 F.3d 1030 (9th Cir. 2000); *Chand v. INS*, 222 F.3d 1066 (9th Cir. 2000); *Lata v. INS*, 204 F.3d 1241 (9th Cir. 2000); *Pal v. INS*, 204 F.3d 935 (9th Cir. 2000); *Kumar v. INS*, 204 F.3d 931 (9th Cir. 2000); *Singh v. INS*, 134 F.3d 962 (9th Cir. 1998); *Prasad v. INS*, 101 F.3d 614 (9th Cir. 1996); *Surita v. INS*, 95 F.3d 814 (9th Cir. 1996); *Singh v. INS*, 94 F.3d 1353 (9th Cir. 1996); *Prasad v. INS*, 47 F.3d 336 (9th Cir. 1995).

In 1987, the Fijian Alliance Party, which had governed Fiji since independence, lost the general election to the National Federation Party-Labour Coalition. The new government had strong support from the Indo-Fijian community. Later that year, the Royal Fiji Military Forces staged a military coup with the purpose of "restor[ing] the political dominance of ethnic Fijians in their home islands." After the new government assumed control, the military staged a second coup in 1987 because it had been excluded from governmental negotiations. Power was then once again handed over from the military to civilians in December 1987.

There were reportedly no deaths associated with either coup, but the police and military dealt harshly with Indo-Fijians during the coups and their aftermath. Many were arrested and abused while in custody. Military and police aside, Indo-Fijians also suffered widespread discrimination, abuse, and harassment at the hands of ethnic Fijians:

> The Department of State received numerous reports of physical abuse of detainees by the military, some of whom were forced to run barefoot on blacktop roads in the hot sun for several kilometers or were dumped in pit latrines or in the sewage treatment holding plants. The most horrible reported attacks on Indo-Fijians include women raped in front of their children, political opponents brutally beaten, detainees forced to walk naked in the streets while holding human excrement, people forced to swim in sewage ponds, and children stripped and beaten for Sunday curfew violations and forced to rub their noses against a concrete floor until their noses bled. Ethnic Fijian youth gangs raided, stoned, and fire bombed Indo-Fijian homes. In 1989, five Hindu temples were burned. In October 1990, an Indian school was burned. Freedom of speech was severely constrained, and political meetings and demonstrations

banned. Fearing for their safety, roughly 35,000 Indo-Fijians fled the country.

*Gafoor*, 231 F.3d at 648-49 (citations, alterations, brackets, and internal quotation marks omitted).

Ali was one of those Indo-Fijians who suffered persecution in the aftermath of the 1987 coups. He was harassed by Fijian soldiers while he and other Muslims were at a prayer meeting in a mosque. He was beaten with the butt of a gun by a Fijian soldier. His house was vandalized and dynamited by military forces. Ethnic Fijians routinely threw rocks at his family, car, and house. His wife was threatened with rape. Ethnic Fijians threatened to burn his house if he did not move. Ethnic Fijians stole from his family.

Ali and his family entered the United States on March 4, 1989, on a visitor visa. Two more coups took place after Ali left—one in 2000 and one in 2006. The 2000 coup was "remarkably similar to the 1987 coups," resulting in further abuse of Indo-Fijians and effectively destroying any improvements that had been made since 1987. *Id.* at 655. After the 2000 coup, though, Fijians began to enjoy free and fair elections. However, in December 2006, the military once again overthrew the government, accusing it of unfairly favoring ethnic Fijian interests. According to the 2006 State Department Country Report for Fiji, "The human rights situation deteriorated greatly following the [2006] coup."

II

Ali filed an application for asylum on October 2, 1989. He was not interviewed by the Government for that application until nearly 14 years later. Not long after the interview, the Government initiated removal proceedings against Ali, alleging that he was subject to removal because he remained in the United States longer than permitted.

Ali appeared before the immigration judge ("IJ") on April 15, 2004. He conceded removability and renewed his applications for asylum, withholding of removal, and relief under the Convention Against Torture. The IJ determined that Ali offered credible testimony and that he established "past persecution." *See* 8 C.F.R. § 1208.13(b)(1). Because Ali had established past persecution, he was entitled to the presumption of a well-founded fear of persecution if he were to return to Fiji, and the IJ so found. *See* 8 C.F.R. § 1208.13(b)(1).

But the IJ concluded the Government had rebutted that presumption in light of improved country conditions, which were detailed in the State Department's 1996 Asylum Profile and 2004 Country Report. The IJ then denied Ali's request for relief.

On administrative appeal, the Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's decision under *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994) (noting that adoption or affirmance of a decision of an IJ, in whole or in part, is "simply a statement that the Board's conclusions upon review of the record coincide with those which the immigration judge articulated in his or her decision"). The BIA held that "[t]he Immigration Judge correctly found that although the respondent had established past persecution, his fear of future persecution had been rebutted by changed country conditions." The BIA held that, in the absence of that presumption, Ali had not met his burden of establishing the elements of his claims for relief. Ali timely petitioned us to review that decision.

While his petition was pending on appeal, Ali moved the BIA to reopen his proceedings on May 25, 2007, in light of new evidence detailing the 2006 coup in Fiji. The BIA denied his motion on August 7, 2007, concluding that the evidence was "new, but not material." Ali timely petitioned us to review that decision, too. We have jurisdiction to review Ali's petitions under 8 U.S.C. § 1252.

Where, as here, the BIA cites *Burbano* and also provides its own review of the evidence and law, we review both the IJ's and the BIA's decisions. *Joseph v. Holder*, 600 F.3d 1235, 1239-40 (9th Cir. 2010). We review de novo the BIA's and IJ's determinations of purely legal questions. *Hamazaspyan v. Holder*, 590 F.3d 744, 747 (9th Cir. 2009). We review factual findings, on the other hand, for substantial evidence. *Halim v. Holder*, 590 F.3d 971, 975 (9th Cir. 2009). Under the substantial-evidence standard, "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* We will uphold the agency's determination "if it is supported by reasonable, substantial, and probative evidence in the record." *Id.* (quoting *Zehatye v. Gonzales*, 453 F.3d 1182, 1185 (9th Cir. 2006)). We review the BIA's denial of a motion to reopen for abuse of discretion. *Garcia v. Holder*, 621 F.3d 906, 912 (9th Cir. 2010). We cannot affirm the BIA or IJ on a ground upon which it did not rely. *Najmabadi v. Holder*, 597 F.3d 983, 986 (9th Cir. 2010). In other words, we "must decide whether to grant or deny the petition for review based on the Board's [or IJ's] reasoning rather than our own independent analysis of the record." *Azanor v. Ashcroft*, 364 F.3d 1013, 1021 (9th Cir. 2004).

III

The BIA and IJ correctly afforded Ali the presumption of a well-founded fear of persecution. But their finding that the Government had rebutted that presumption is not supported by substantial evidence because they failed to make an individualized determination of how the changed country conditions in Fiji impacted Ali's specific harms and circumstances. In addition, the BIA abused its discretion when it denied Ali's motion to reopen because it failed to analyze the effect of the 2006 coup on Ali's presumption of a well-founded fear of persecution.

A

**[1]** The petitioner bears the burden of establishing his eligibility for asylum. 8 C.F.R. § 1208.13(a). To satisfy this burden, an alien must show he is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his country of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[2] 8 U.S.C. § 1101(a)(42).

**[2]** An alien who has suffered past persecution is presumed to have a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1). The Government may rebut that presumption if it establishes, by a preponderance of the evidence, that (1) there "has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of future persecution" or (2) "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . ." *Id.*; *see also Hanna v. Keisler*, 506 F.3d 933, 938 (9th Cir. 2007) (citing *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004)). This presumption only

---

[2]An application for asylum is automatically considered a simultaneous request for withholding of removal. 8 C.F.R. § 1208.3(b). The Attorney General is required to withhold removal if "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The elements of an application for withholding of removal are essentially the same as that of asylum, except the burden of proof is higher. "To qualify for withholding of removal, an alien must demonstrate that it is more likely than not that he would be subject to persecution on one of the specified grounds." *Robleto-Pastora v. Holder*, 591 F.3d 1051, 1057 (9th Cir. 2010) (citations and internal quotation marks omitted). A showing of past persecution entitles an alien to a presumption of eligibility for withholding of removal, but the alien bears the burden "to establish such persecution." *Id.* (citing *Fedunyak v. Gonzales*, 477 F.3d 1126, 1130 (9th Cir. 2007); *Unuakhaulu v. Gonzales*, 416 F.3d 931, 938-39 (9th Cir. 2005)).

applies to fear based on the original claim and not to fear of persecution from a new source. *See* 8 C.F.R. § 1208.13(b)(1).

**[3]** When the Government comes forward with evidence of changed country conditions tending to rebut the presumption of a well-founded fear of persecution, the IJ must make an "individualized determination" of how the changed circumstances affect the alien's specific situation. *Marcos v. Gonzales*, 410 F.3d 1112, 1120-21 (9th Cir. 2005); *Smolniakova v. Gonzales*, 422 F.3d 1037, 1051-52 (9th Cir. 2005).

The hallmark of an "individualized determination" is a tailored analysis of the petitioner's specific harms and circumstances. "Where past persecution has been established, *generalized* information from a State Department report on country conditions is not sufficient to rebut the presumption of future persecution." *Kamalyan v. Holder*, 620 F.3d 1054, 1059 (9th Cir. 2010) (citing *Molina-Estrada v. INS*, 293 F.3d 1089, 1096 (9th Cir. 2002)). To be sure, country reports may be employed to rebut the presumption, but the IJ and BIA must apply the findings from the reports to the petitioner's specific harms and circumstances. *See, e.g.*, *Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008); *Kumar*, 204 F.3d 931; *Molina-Estrada*, 293 F.3d at 1096 (citing *Kumar*, 204 F.3d 931); *but see Kamalyan*, 620 F.3d at 1057 ("[Country reports] typically are not amenable to an individualized analysis tailored to an asylum applicant's particular situation.") (citations and internal quotations omitted). In *Lal v. INS*, which involved an Indo-Fijian petitioner, we observed:

> We have long held that the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship of that particular information contained in the relevant country reports.

255 F.3d 998, 1010 (9th Cir. 2001) (quoting *Chand*, 222 F.3d at 1079).

In *Lal*, we concluded the BIA had failed to conduct an individualized analysis because it relied on broad propositions in country reports without reference to the specific harms that the petitioner had suffered. *Id.* at 1011. We acknowledged that the reports stated generally there was no evidence of widespread human rights violations in Fiji. *Id.* But we also observed that the reports stated that harassment, abuse, and intimidation of Indo-Fijians continued. *Id.* We reasoned: "The fact that such abuses may not have been widespread or may not have formed a clear pattern does not mean that particular individuals who have been targeted in the past are safe." *Id.* We went on to hold:

> In such a situation, the BIA must ask whether the INS has shown through record evidence that the individual who suffered past persecution is among the general population that is not suffering from a "sustained pattern" of human rights violations, or whether the applicant is among the unlucky few who are most vulnerable to abuse. Such an assessment must take account of the specific attributes of the past persecution on record.

*Id.* (citing *Chand*, 222 F.3d at 1079).

Looking to the specific circumstances of the petitioner's persecution in *Lal*, we concluded the petitioner might very well have been one of those individuals "who are most vulnerable to abuse." *Id.* The petitioner was a well-known opposition leader, his attacks following the 1987 coup were not random, and he was placed on a government "blacklist." *Id.* Given the nature of these harms, the general proposition that conditions were improving for Indo-Fijians did not rebut the petitioner's presumption of a well-founded fear of persecution. *Id.*

**[4]** Here, neither the IJ nor the BIA conducted an individualized analysis of the changed country conditions in Fiji with regard to Ali's specific circumstances and harms.

The IJ based his analysis on two documents: the State Department's 1996 Asylum Profile and 2004 Country Report for Fiji. The Asylum Profile states that, while the police and military abused Indo-Fijians during the 1987 coups, the State Department is "unaware of any wide spread abuse as occurred in 1987." The more recent 2004 Country Report notes that, after the last coup attempt in 2000, Fiji has enjoyed free and fair elections. The Country Report also remarks that Indo-Fijians "dominate[ ] the business sector and enjoy[ ] higher average incomes . . . ."

However, the 2004 Country Report also notes there are "serious problems in some areas." "Tension between ethnic Fijians and Indo-Fijians has been a longstanding problem . . . ." Indo-Fijians still face discrimination in the political sector. And government policies on "hiring, education, and land tenure" tend to discriminate against Indo-Fijians in favor of ethnic Fijian interests.

The IJ summarized how conditions have changed since the 1987 coups—which is certainly relevant to Ali's circumstances—but, as in *Lal* and *Chand*, the IJ did not apply that analysis to Ali's specific circumstances. *See Lal*, 255 F.3d at 1010-11; *Chand*, 222 F.3d at 1078-80. Instead, he simply concluded:

> What the background information does not support, is that the Indo-Fijians' life or freedom is necessarily at risk in Fiji currently, given the current economic and political situation in the country as reported by the State Department of the United States. For the foregoing reasons, this Court finds that the presumption of persecution has been rebutted by the objective evidence in the record.

Likewise, the BIA simply concluded, "[W]hile ethnic discrimination remains a serious problem in Fiji, the respondent has failed to demonstrate that he is at particular risk or that his

predicament is appreciably different from the dangers faced by his fellow Indo-Fijians."

**[5]** In other words, the IJ and the BIA analyzed the general risks that Indo-Fijians face, but they did not determine whether Ali "is among the unlucky few who are most vulnerable to abuse." *Lal*, 255 F.3d at 1011 (citing *Chand*, 222 F.3d at 1079). "Such an assessment must take account of the *specific attributes* of the past persecution on record." *Id.* (emphasis added) (citing *Chand*, 222 F.3d at 1079). Here, the IJ and the BIA failed to do that. Among other omissions, they failed to analyze how the changed country conditions might affect a person who had been targeted by and suffered persecution at the hands of the military. Because the agency did not conduct an individualized analysis, we must remand the petition so that the agency may perform such an examination in the first instance.

B

The BIA abused its discretion when it denied Ali's motion to reopen because Ali has a "reasonable likelihood" of meeting the requirements for asylum, based on the 2006 coup in Fiji. *Garcia*, 621 F.3d 912.

**[6]** A motion to reopen must be based on evidence that is "material and was not available and could not have been discovered or presented at the former hearing." *Id.* (quoting 8 C.F.R. § 1003.2(c)(1)) (internal quotation marks and alterations omitted). The motion "will not be granted unless it establishes a prima facie case for relief." *Id.* (citation omitted). "A prima facie case is established when the evidence reveals a reasonable likelihood that the statutory requirements for relief have been satisfied." *Id.* (citation and internal quotations marks omitted). When the BIA reviews a motion to reopen, it must show proper consideration of all factors, both favorable and unfavorable. *See Franco-Rosendo v. Gonzales*, 454 F.3d 965, 967-68 (9th Cir. 2006).

Ali filed his motion to reopen with the BIA based on the 2006 coup in Fiji. In his motion, he discussed how the 2006 coup—the fourth in 19 years—resulted in the overthrow of the democratically elected government. He argued that the resulting instability has caused a deterioration in conditions for Indo-Fijians and destroyed any progress that had been made since the 2000 coup. Ali attached a number of supporting documents, including several news articles detailing the coup.

The exhibits, and in particular the 2006 State Department Country Report, support Ali's motion. The Country Report reads:

> Prior to the [2006] December coup the government generally respected the human rights of its citizens, although there were serious problems in some areas. The human rights situation deteriorated greatly following the coup. . . . [P]roblems during the year included . . . continuing deep divisions between indigenous Fijians (55 percent of the population) and Indo-Fijians (37 percent) . . . . [Moreover,] [f]ollowing the coup, there were numerous incidents of the Republic of Fiji Military Forces (RFMF) detaining without warrant and abusing persons who had voiced opposition to the coup or who supported a return to democratic government.

The BIA nevertheless denied Ali's motion to reopen. The BIA acknowledged that conditions had changed after it denied Ali's petition, but it concluded the changes were not "material." It reasoned that Ali had "not shown how the military persons he was persecuted by are connected in any way to the current military regime or why he has an independently objective basis for fearing this new regime."

**[7]** The BIA abused its discretion, though. Contrary to the BIA's conclusion, the evidence "reveals a reasonable likeli-

hood that the statutory requirements for relief have been satisfied." *Garcia*, 621 F.3d 912. Since Ali had established past persecution, he enjoyed the presumption of a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1). Thus, when the BIA analyzed Ali's motion, it should have considered how the changed country conditions impacted that presumption. But it did not.

The new material, detailing the 2006 coup, could have made it more difficult for the Government to rebut Ali's presumption of a well-founded fear of future persecution. Certainly, there is a "reasonable likelihood" that the Government could have been unable to do so. *Garcia*, 621 F.3d at 912. But the BIA did not consider what effect the 2006 coup had on the presumption. Nor did it consider any other favorable factors, such as any similarities between the 1987, 2000, and 2006 coups. *Franco-Rosendo*, 454 F.3d at 967-68 (holding that when the BIA reviews a motion to reopen, it must show proper consideration of all factors, both favorable and unfavorable).

**[8]** For these reasons, the BIA abused its discretion when it denied Ali's motion to reopen. We therefore remand the petition to the BIA for its re-consideration.

IV

We grant both of Ali's petitions for review and remand his case to the BIA for its re-examination. We do not prejudge the results of the inquiry. We need not, and do not, reach any other issue urged by the parties on appeal.

**PETITIONS GRANTED; REMANDED.**