**Brijmati SINGH, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 96–70930.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1997.

Decided Jan. 22, 1998.

John M.A. Burgess and Suzanne B. Friedman, Law Office of John M.A. Burgess, San Francisco, California, for the petitioner.

F. Franklin Amanat and Ethan B. Kanter, United States Department of Justice, Washington, DC, for the respondent.

Before: GOODWIN and T.G. NELSON, Circuit Judges, and RHOADES,* District Judge.

RHOADES, District Judge:

## I. Overview

Petitioner Brijmati Singh, a native and citizen of Fiji, petitions for review of the Board of Immigration Appeals' denial of her application for asylum and withholding of deportation. For the reasons stated below, we deny the Petition.

## II. Background

### A. Events in Fiji

The population of Fiji is roughly evenly divided between ethnic Fijians (the majority

---

* Honorable John S. Rhoades, Sr., Senior United States District Court Judge for the Southern District of California, sitting by designation.

of whom are Christian) and Fijians of Indian descent (most of whom are Hindu). Considerable racial and religious tension exists between these two groups. In 1987 the Fijian military, which consists largely of ethnic Fijians, overthrew the democratic government and established a regime that favors ethnic Fijians.

Petitioner is an Indo–Fijian of the Hindu faith. Her life in Fiji became difficult after the coup. All of her family members emigrated to Australia in the wake of the societal upheaval that the coup caused.[1] According to Petitioner, her Indo–Fijian neighbors fled their homes in order to avoid harassment at the hands of ethnic Fijians. This left Petitioner and her daughter as the only Indo–Fijians in their village.

Petitioner claims that "every night [her] house was stoned by the Fijian natives." (A.R. at 136.) Petitioner reported a stoning incident to the police, but by the time they arrived the perpetrators had departed and the police took no further action. In addition, Petitioner claims that ethnic Fijians loitered in her yard, vandalized her property, stole coconuts from her trees, and occasionally stole items from her garage. (*Id.* at 126.) Also, Petitioner claims that individuals burglarized her home on one occasion. Again, Petitioner alleges that the police took no action. All of these incidents took place in 1987 except for the burglary, which took place in 1989. (*Id.* at 25, 126.) [2]

To escape this treatment, Petitioner sold her home at a loss and moved to an apartment located closer to her workplace and her daughter's school. Subsequently, some of her teenage daughter's Indo–Fijian schoolmates were raped, which caused Petitioner to fear for her daughter's safety. Petitioner contends that she escorted her daughter to school and that her daughter had to return from school in the company of others. Petitioner's daughter then would lock herself in the apartment until Petitioner arrived home.[3]

In addition to these hardships, the new government banned Hindu religious gatherings. Many Hindu temples were destroyed, including Petitioner's. Also, in 1990 the government enacted a new constitution that guarantees political supremacy for ethnic Fijians.

**B. Events In The United States**

On January 10, 1992 Petitioner left Fiji and arrived in the United States on a six-month visitor's visa. (A.R. at 24.) Petitioner then applied for asylum but the Asylum Office denied her request. Nonetheless, Petitioner never left the United States. Accordingly, on March 22, 1994 the Immigration and Naturalization Service ("INS") instituted deportation proceedings against Petitioner. The INS charged her with deportability under 8 U.S.C. § 1251, for remaining in the United States longer than her visa permitted.

Petitioner conceded deportability at a deportation hearing and the immigration judge designated Fiji as the country of deportation.[4] Petitioner requested withholding of deportation and again applied for asylum. The immigration judge denied these requests.

Petitioner appealed to the Board of Immigration Appeals ("BIA"), which af-

---

1. Petitioner attempted to join her family in Australia, but the Australian immigration system prevented her from doing so.

2. Petitioner's claims are consistent with a 1994 study that the Department of State conducted of Fiji. That study observed:

    Ethnic and communal differences ... cause significant social tensions in Fiji. In some instances, this tension results in the harrassment [sic] and intimidation of ethnic Indians by ethnic Fijians. The police are sometimes either unable or unwilling to prevent such harrassment [sic], which is frequently at a personal level.... Indo–Fijians are also sometimes the victims of crime based. on race. Inadequate police protection contributes to the frequency

and seriousness of these incidents. Crimes committed against the Indo–Fijian population were particularly egregious in 1987–88 following the coups.

    (A.R. at 94.)

3. Petitioner has not alleged that events such as the burglary and stonings took place after she moved from her village. Petitioner merely has alleged that after she moved, several people on the streets made uncomplimentary remarks to her and her daughter. (A.R. at 26.)

4. The immigration judge had to designate a country because Petitioner declined to do so.

firmed the decision of the immigration judge on September 5, 1996. Petitioner then timely appealed to this Court, which has jurisdiction to review the decision of the BIA[5] pursuant to 8 U.S.C. § 1105a(a)(2) (repealed 1996).[6]

## III. Discussion

We first will discuss whether the BIA erred by denying Petitioner's request for asylum. Second, we will discuss whether the BIA erred by denying her request for withholding of deportation.

### A. Whether The BIA Erred By Denying Petitioner's Application For Asylum

#### 1. Standard Of Review

■■■■ We review the BIA's decision that Petitioner has not established eligibility for asylum under the substantial evidence standard. *Ghaly v. INS,* 58 F.3d 1425, 1431 (9th Cir.1995). Under this standard, "a petitioner contending that the [BIA]'s findings are erroneous must establish that the evidence not only *supports* that conclusion, but *compels* it." *Id.* at 1431 (internal quotation marks omitted). "This strict standard bars a reviewing court from independently weighing the evidence and holding that petitioner is eligible for asylum, except in cases where compelling evidence is shown." *Kotasz v. INS,* 31 F.3d 847, 851 (9th Cir.1994). Thus, we must deny the Petition unless Petitioner presented evidence "so compelling that no reasonable factfinder could find" that Petitioner has not established eligibility for asylum. *INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 816–17, 117 L.Ed.2d 38 (1992).

#### 2. Legal Standards Governing Eligibility For Asylum

Section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(b), gives the Attorney General discretion to grant asylum to a refugee. A refugee is an alien who is unwilling to return to the country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

■■■■ To establish eligibility based on a well-founded fear of persecution, the alien must have a subjectively genuine and objectively reasonable fear. *Arriaga–Barrientos v. INS,* 937 F.2d 411, 413 (9th Cir.1991). An alien satisfies the subjective component of this test by credibly testifying that the alien genuinely fears persecution. *Cuadras v. United States INS,* 910 F.2d 567, 570–71 (9th Cir.1990). An alien satisfies the objective component by pointing to "credible, direct, and specific evidence in the record … that would support a reasonable fear of persecution." *Ghaly,* 58 F.3d at 1428 (quoting *Arriaga–Barrientos,* 925 F.2d at 1178–79).[7]

■■■■ Here, Petitioner has met the subjective component of the test because the immigration judge found her testimony that she fears persecution to be credible. (A.R. at 28–29); *see also Sarvia–Quintanilla v. INS,* 767 F.2d 1387, 1395 (9th Cir.1985) (stating that a reviewing court should give deference to an immigration judge's credibility finding). The question thus becomes whether Petitioner can establish that a reasonable

---

5. Although the BIA conducted a limited independent review of the record, it also expressly adopted the immigration judge's opinion. Accordingly, we also review the decision of the immigration judge to the extent the BIA's opinion incorporated it. *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995).

6. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (1996) repealed 8 U.S.C. § 1105a and replaced it with another judicial review provision. *See* IIRIRA § 306. The IIRIRA was enacted on September 30, 1996 and most of its provisions did not take effect until April 1, 1997, long after Petitioner

filed this appeal. *See* IIRIRA § 309(a). It thus does not affect the instant case.

7. Petitioner contended at oral argument that the BIA applied the wrong legal standard in assessing whether Petitioner has a well-founded fear of persecution. Specifically, Petitioner argued that the BIA failed to inquire into both the subjective genuineness and objective reasonableness of Petitioner's fear. This argument has no merit. The BIA expressly adopted the immigration judge's opinion. (A.R. at 2.) The immigration judge, in turn, explicitly applied the two-prong test. (A.R. at 28–29.)

person in her circumstances would fear persecution on the basis of race or religion. Petitioner can do this by demonstrating that she suffered persecution in the past because "[a]n alien who establishes past persecution is presumed to have a well-founded fear of future persecution." *Gaya Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996).[8]

However, in order to establish a well-founded fear, "[P]etitioner cannot simply prove that there exists a generalized or random possibility of persecution ...; [s]he must show that [s]he is at particular risk—that [her] predicament is appreciably different from the dangers faced by [her] fellow citizens." *Kotasz*, 31 F.3d at 852 (internal quotation marks omitted). Petitioner must establish that the mistreatment she suffered was directed personally toward her, and that it was substantially more grievous in kind or degree than the general manifestation of hostility between the competing ethnic and religious groups in Fiji. Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum to everyone who wishes to improve his or her life by moving to the United States without an immigration visa. *See id.*

### 3. Whether The Evidence Compels A Finding That Petitioner Experienced Persecution Or Has A Well-Founded Fear Of Persecution

As discussed below, when compared with similar Ninth Circuit cases, it becomes clear that Petitioner's allegations do not compel a finding of persecution. Additionally, specific facts in the record indicate that the treatment she received was not so extreme that it constitutes persecution, let alone compels a finding that it does. Moreover, even if such treatment could rise to the level of persecution, Petitioner has not demonstrated that many of the incidents were targeted particularly toward her, or that they occurred because of racial or religious animus.

### a. Our Case Law Establishes That The Evidence Does Not Compel A Finding Of Persecution

The Immigration and Nationality Act does not define "persecution" or specify what acts constitute persecution. We have described it, however, as " 'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.' " *Ghaly*, 58 F.3d at 1431 (quoting *Elias–Zacarias*, 502 U.S. at 489, 112 S.Ct. at 819–20). Although persecution does not require bodily harm or a threat to life or liberty, *Desir v. Ilchert*, 840 F.2d 723, 726–27 (9th Cir.1988), "persecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Ghaly*, 58 F.3d at 1431 (internal quotation marks omitted). For example, "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution'...." *Id.*[9]

The key question is whether, looking at the cumulative effect of all the incidents Petitioner has suffered, the treatment she received rises to the level of persecution. *Surita v. INS*, 95 F.3d 814, 819 (9th Cir. 1996). This inquiry is heavily fact-dependent, and is perhaps best answered by comparing the facts of Petitioner's case with

---

8. Petitioner's claim that she has an objectively reasonable fear of future persecution hinges on whether she experienced persecution in the past. She has not alleged that conditions in Fiji have worsened such that a greater risk of persecution has arisen since she left; indeed, circumstances appear to have improved. (*See* A.R. at 94–95.) Petitioner merely fears a continuation of the treatment she received before (although the possibility always exists that something more severe could happen). She cannot have a well-founded fear of persecution upon returning to Fiji more than ten years after the coups if she did not experience any persecution during the five year aftermath of the coups when conditions were worse. Thus, the question becomes whether Petitioner experienced persecution when she resided in Fiji.

9. Persecution need not be directly at the hands of the government; private individuals that the government is unable or unwilling to control can persecute someone. *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997).

those of similar cases. *See id.* at 820–21 (comparing Indo–Fijian alien cases).

*Kamla Prasad v. INS,* 47 F.3d 336 (9th Cir.1995) is a somewhat similar case. Like Petitioner, an Indo–Fijian in *Kamla Prasad* had rocks thrown at his house by ethnic Fijians who also attempted to steal his property. His wife claimed that the Fijian military harassed her. In addition, ethnic Fijians in military uniforms forced Prasad from his vehicle at gunpoint and jailed him for several hours without good cause. While in jail, his captors hit him in the stomach and kicked him from behind. They also questioned him about his political affiliations and warned him that they would arrest him again if he continued his political activities. The police refused to investigate the incident because of Prasad's political affiliations.

We noted that "a reasonable factfinder *could* have found [these facts] sufficient to establish past persecution...." *Id.* at 340. However, we held that Prasad's treatment was not so extreme that it *compelled* the factfinder to do so. *Id.* Accordingly, we upheld the BIA's denial of Prasad's asylum application.

We encountered another Indo–Fijian asylum case in *Surita v. INS,* 95 F.3d 814 (9th Cir.1996). In that case, ethnic Fijians robbed Surita because of her race ten to fifteen times in the course of one week while she travelled to and from work. The police stated that they could not help her. Additionally, Fijian soldiers broke down the door of Surita's parents' home, held the family at gunpoint, looted the house, and warned Surita and her family to leave the country. These soldiers specifically threatened to rape and kill Surita. Again, the police stated without elaboration that they could do nothing. We concluded that these facts compelled a finding of persecution and thus reversed the BIA's denial of Surita's asylum application. *Id.* at 819–20.

In still another Indo–Fijian asylum case, *Gaya Prasad v. INS,* 101 F.3d 614 (9th Cir.1996), the government jailed the petitioner twice for days at a time. During his detentions, military authorities beat him, urinated on him, and forced him to lick their saliva off the floor. Government agents also beat the petitioner on another occasion. In addition, the petitioner lost his job because of his political activism. We held that these facts compelled a finding of persecution. *Id.* at 617.

Comparing the case at bar to our other Indo–Fijian alien cases, it becomes clear that Petitioner's treatment does not compel a finding of persecution; her treatment was far less severe than the treatment the alien received in each of the other Indo–Fijian alien cases. Unlike the alien in *Gaya Prasad,* Petitioner was not detained by government forces, beaten, or otherwise subjected to sadistic and degrading treatment. Likewise, Petitioner did not lose her job.[10]

Additionally, unlike the alien in *Surita,* government authorities never threatened Petitioner or held her at gunpoint. Although Petitioner has alleged that townspeople threatened her, she has not alleged that people credibly threatened her with grave bodily harm, as they did to Surita. Also, Petitioner has not shown that she had items stolen nearly as many times as Surita did. Moreover, the inference that the police in *Surita* refused to help the petitioner because of her race is stronger than in the case at bar. In *Surita,* the police provided no protection despite the fact that people routinely and predictably robbed Surita on her way to and from work. By contrast, the police in the case at bar responded to Petitioner's location when she called them, but they took no further action. As the immigration judge noted, this could have been due to a lack of suspects, few leads, etc.[11] Thus, the facts of the case at bar are far less severe than those of either *Surita* or *Gaya Prasad.*

---

**10.** Indeed, Petitioner did not resign her position before she left Fiji because she intended to return. (A.R. at 49.)

**11.** It is not clear whether Petitioner called the police when people loitered in her yard, vandalized her property or stole items from her garage. In any event, the occurrence of these events may not have been as regular and predictable as the numerous robberies of Surita that occurred on her way to and from work every day.

Indeed, the facts of the instant case are less severe than those of *Kamla Prasad,* in which we held that the facts did *not* compel a finding of persecution. Petitioner was never forced from her vehicle at gunpoint, jailed for no reason, hit, kicked, or coercively questioned about her political affiliations. Petitioner has alleged merely that people threw rocks at her house, damaged some of her property, burglarized her home on one occasion, and stole laundry, coconuts, and items from her garage. These facts are far less severe than those of *Kamla Prasad.* Because the facts of *Kamla Prasad* did not compel a finding of persecution, the facts of the case at bar necessarily do not compel such a finding.[12]

### b. Facts In The Record Undercut The Objective Basis For Petitioner's Fear Of Persecution

Moreover, specific facts in the record undercut Petitioner's claim that she experienced treatment so extreme that she has a well-founded fear of persecution. For example, Petitioner's brief alleges that she escorted her daughter to school because she feared for her daughter's safety. (Pet'r's Br. at 4.) However, the record reveals that Petitioner only escorted her daughter halfway to school, and then allowed her to proceed the rest of the way alone. (A.R. at 47–48.) The fact that Petitioner allowed her daughter to walk alone indicates that the danger was not as great as Petitioner's brief makes it seem.

Moreover, the record indicates that Petitioner's circumstances in Fiji were not so severe that she had to flee; indeed, she waited until five years after the coup to leave. In fact, Petitioner has admitted that when she left Fiji she intended to return, but when she arrived in the United States she liked it here and decided to stay. (A.R. at 49.) One would expect that if Petitioner truly had experienced persecution, she would have left the country earlier and would have not intended to return.

Significantly, Petitioner has stated that she left Fiji not because of persecution, but primarily because of a lack of educational and employment opportunities for her daughter. When asked why she left, Petitioner responded: "[F]or the fear of my daughter, because Indians were getting no where [sic], they couldn't get into schools, they had no jobs, like and then for my daughter's education, and things like—that was the main reason for me to leave." (*Id.*) These facts indicate that the direct treatment Petitioner received at the hands of ethnic Fijians was not so severe that it was the primary impetus for Petitioner to leave. Rather, general societal conditions (albeit attributable to racial discrimination) were the main reason. This belies Petitioner's claim that an objectively reasonable basis exists for her to fear particularized persecution.

In addition, the immigration judge found that all the incidents Petitioner complains of occurred in 1987 during the immediate aftermath of the coups.[13] The State Department has observed that Indo–Fijians experienced particularly severe treatment during this period. (*Id.* at 94.) Notably, Petitioner has not cited any serious mistreatment of her or her daughter that occurred after they moved from their house to their apartment in 1990. This suggests that Petitioner's circumstances dramatically improved after she moved, which undercuts her assertion that she "would not be safe anywhere in [Fiji]." (Pet'r's Br. at 13.)[14]

12. This case joins *Kamla Prasad, Gaya Prasad,* and *Surita* as a decision involving an Indo–Fijian who seeks asylum based on persecution. In each case, we articulated the same legal standards and applied those standards to the facts at hand. The decision to affirm or reverse the BIA was based on a careful examination of the particular facts to determine whether persecution actually had taken place. These cases make clear that the inquiry is heavily fact-dependent. There is no language in the cases that reversed the BIA (*Gaya Prasad* and *Surita*) that indicates that *Kamla Prasad,* which denied asylum, was thereby overruled. Our opinion in *Surita* makes this

clear in its analysis and in its conclusion that the facts of that case were more akin to those of *Gaya Prasad* than to those of *Kamla Prasad.* In deciding *Surita,* we merely distinguished *Kamla Prasad* on its facts.

13. The record indicates, however, that the burglary occurred in 1989. (A.R. at 126.)

14. Nevertheless, other facts in the record indicate that the situation in Fiji provided an objectively reasonable basis for Petitioner to fear persecution. For example, Petitioner's family saw

In light of the foregoing, a reasonable fact-finder could conclude that Petitioner does not have an objectively reasonable basis to fear persecution, despite facts that might indicate the contrary.

### c. Petitioner Has Not Demonstrated That Much Of The Treatment She Experienced Was Directed Particularly Toward Her, Or That It Arose From Racial Or Religious Animus

Moreover, even if the hardships Petitioner suffered cumulatively could amount to persecution, Petitioner still must demonstrate that the persecution she suffered was "appreciably different" from the hardships suffered by Indo–Fijians in general. *Kotasz*, 31 F.3d at 852. She also must establish that she suffered the hardships because of her race or religion. Petitioner has not made either of these showings with respect to the most serious incidents she alleges.

Petitioner has alleged that individuals broke into her home and stole all her valuables. However, Petitioner has not claimed that she saw the perpetrators, nor has she explained why she believes they were ethnic Fijians. Even if they were ethnic Fijians, Petitioner has not demonstrated that they robbed her because of her race or religion. Although the State Department has observed that Indo–Fijians are sometimes the victims of crime because of their race, it also has observed that street crime affects both races, and the primary motivation for it is financial gain. (A.R. at 96.) In short, Petitioner has not established that the burglary was anything more than random street crime that had nothing to do with racial or religious animus.

In addition, as discussed above, Petitioner has not established that the police department's failure to investigate further the

fit to leave the island in the aftermath of the coups. It seems unlikely that individuals would leave their homes and jobs and move to a foreign country without strong reasons for doing so. Also, Petitioner's Indo–Fijian neighbors left their village, which indicates that the situation there was quite troubling. Petitioner herself sold her home at a loss in order to move away from the ethnic Fijians who lived there. However, we may not reweigh the evidence to determine for ourselves whether Petitioner faced persecution.

crimes she suffered stemmed from racial or religious motivations. Petitioner has candidly admitted that by the time the police responded to a rock-throwing incident, tranquility had been restored and the perpetrators had departed. The police simply may not have had leads or suspects. The same could be true of their failure to apprehend the individuals who burglarized Petitioner. Notably, the police at least responded when Petitioner called them.

Moreover, Petitioner's assertion that some of her daughter's schoolmates were raped does not establish unique persecution of Petitioner. In *Kamla Prasad*, the petitioner's cousin was murdered and soldiers raped the decedent's wife. We held that this did not establish persecution because the petitioner had not demonstrated that this was connected uniquely to the petitioner, nor was there evidence that these crimes were motivated by racial or religious animus. We held that "attacks on family members do not necessarily establish a well-founded fear of persecution absent a pattern of persecution tied to the petitioners." *Kamla Prasad*, 47 F.3d at 340. By the same token, attacks on Petitioner's daughter's schoolmates do not support a finding of persecution against Petitioner without a connection to her, especially where evidence about the reasons for the attacks is lacking.

In addition, Petitioner's reports of her temple being destroyed and religious restrictions do not support a finding of individualized persecution of Petitioner. Numerous temples were destroyed and religious restrictions applied to the entire populace. (A.R. at 45–46); *Kamla Prasad*, 47 F.3d at 340. Other hardships, such as the Fijian constitution that guarantees political supremacy for ethnic Fijians, are similarly not targeted toward Petitioner in particular.[15]

We merely determine whether the evidence *compels* such a conclusion.

15. The Administrative Record contains numerous exhibits that document the difficult conditions in Fiji. This Court previously has taken note of these conditions and rejected them as a basis for establishing persecution or a well-founded fear thereof. *See Kamla Prasad*, 47 F.3d at 340.

In sum, the incidents Petitioner has suffered do not compel a finding that Petitioner experienced persecution. Indeed, facts in the record undercut Petitioner's claim that she was persecuted. Even if the incidents Petitioner suffered could amount to persecution, Petitioner has not demonstrated that the most severe incidents resulted from racial or religious bias, or that they were directed particularly toward her. This belies her claim that she has an objectively reasonable basis to fear persecution based on race or religion that is "appreciably different" from the hardships experienced by Indo–Fijians in general. Thus, the evidence does not compel the conclusion that Petitioner is eligible for asylum.

### B. Whether The BIA Erred By Denying Petitioner's Request For Withholding Of Deportation

We next must address whether the BIA erred by denying Petitioner's application for withholding of deportation.[16] Withholding of deportation differs from a granting of asylum in two ways. First, withholding of deportation is mandatory upon a proper showing of eligibility. Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) *requires* the Attorney General, subject to certain exceptions not relevant here, to withhold deportation if "such alien's life or freedom would be threatened ... on account of race, religion, nationality, membership in a particular political group, or political opinion." 8 U.S.C. § 1253(h).

Second, the required showing for withholding of deportation is more stringent than that required for asylum. An alien is eligible for withholding of deportation only if the alien demonstrates a "clear probability of persecution" by showing that it is "more likely than not that the alien will be persecuted if deported." *Ghaly*, 58 F.3d at 1429 (citation omitted).

Because the evidence does not compel a finding of persecution or a well-founded fear thereof, it necessarily does not compel a finding that Petitioner has shown a "clear

probability" of persecution if she were to return to Fiji. *See Fisher v. INS*, 79 F.3d 955, 961 (9th Cir.1996) (en banc). Accordingly, the evidence does not compel a finding that Petitioner is eligible for withholding of deportation.

### IV. Conclusion

In sum, Petitioner has not established that she experienced persecution or that she has a well-founded fear of persecution. She thus has failed to establish eligibility for asylum and therefore cannot establish eligibility for withholding of deportation.

Petition denied.

---

**16.** The Court also evaluates the BIA's conclusion that Petitioner did not establish eligibility for withholding of deportation under the substantial evidence standard. *Desir*, 840 F.2d at 726.