**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAVIN SINHA; PRITI PRAVEENA
SINGH,
                    *Petitioners,*

            v.

ERIC H. HOLDER, JR., Attorney
General,
                    *Respondent.*

Nos. 04-73843
        07-72289

Agency Nos.
A079-286-957
A079-286-958

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 11, 2008—San Francisco, California

Filed February 10, 2009

Before: A. Wallace Tashima, Marsha S. Berzon and
N. Randy Smith, Circuit Judges.

Opinion by Judge Berzon

**COUNSEL**

Joseph J. Siguenza, Esq., Attorney (argued), and Ashwani K. Bhakhri, Esq., Attorney (briefed), Law Offices of Ashwani K. Bhakhri, Burlingame, California, for the petitioners.

W. Daniel Shieh, Esq., Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC (argued and briefed); Margot Nadel, Esq., Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, Terri J. Scadron, Assistant Director, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, Francis W. Fraser, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, Gregory G. Katsas, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, DC, and Peter D. Keisler, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, DC, were on the briefs, for the respondent.

---

**OPINION**

BERZON, Circuit Judge:

Petitioner Navin Sinha and his wife, Petitioner Priti Praveena Singh, are ethnic Indians and citizens of Fiji. In 2001, Sinha submitted an application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT) for himself and, derivatively, his wife Singh.[1] The Immigration Judge (IJ) denied all relief, and the Board of Immigration Appeals (BIA) adopted and affirmed that decision. Petitioners appear before this Court to challenge the

---

[1]Priti Praveena Singh did not file a separate asylum application on her own behalf. Her eligibility for relief is based upon Sinha's claim. *See* 8 U.S.C. § 1158(b)(3)(A).

BIA's dismissal of their appeal, and also to contest the BIA's denial of their subsequently-filed motion to reopen, based on changed country conditions. We grant the petition for review on the removal order and order the motion to reopen held in abeyance.

## I. BACKGROUND

Sinha's claims for asylum and for withholding of removal are based upon his alleged past persecution and his fear of future persecution on account of his ethnicity as an Indo-Fijian.[2] He also seeks relief under the CAT because he fears being tortured if he is returned to Fiji.

As Sinha's testimony and country-conditions evidence show, over the past twenty years Fiji's ethnic Indian minority has been treated harshly and, at times, violently by the native Fijian majority. There has been longstanding tension between the two groups, exacerbated by an uneven distribution of power and wealth. The ethnic Indian minority (whom we call "Indo-Fijians") have controlled most of the country's private businesses, while the native Fijian majority (whom we call "native Fijians") have maintained a monopoly on land-ownership and have largely controlled the military and the national government. In 1987 and again in 2000, racial tensions culminated in coups in which ethnic Fijians, backed by the military, ousted sitting Indo-Fijian-dominated govern-

---

[2]Sinha also alleged in his asylum application that he has a well-founded fear based on his religion (as a practicing Christian) and his political opinion. Petitioners' opening brief, however, refers only to "race/ethnicity" and "religion" as the protected grounds on which Sinha's claim is based. As the opening brief never mentions "political opinion," we consider that claim waived. *See Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996). Further, the record contains no evidence suggesting that petitioners' past experiences or future fear bears any relationship to their religion. We therefore uphold as supported by substantial evidence the IJ's determination that Sinha had failed to establish eligibility for asylum on account of his religion.

ments and took power. Both coups occasioned widespread popular violence against individuals of Indo-Fijian ethnicity. We have recognized the "severe mistreatment [Indo-Fijians] have suffered" in a number of previous cases. *See Gafoor v. INS*, 231 F.3d 645, 647 (9th Cir. 2000); *see also Narayan v. Ashcroft*, 384 F.3d 1065, 1066 n.2 (9th Cir. 2004); *Singh v. INS*, 94 F.3d 1353, 1356-57 (9th Cir. 1996).

Sinha testified to four separate incidents of mistreatment that he personally experienced, which he claims cumulatively constitute past persecution or, in the alternative, contribute to his showing of a well-founded fear of future persecution.

First, in 1990, when Sinha was seventeen years old, a group of native Fijians approached him and his friend after soccer practice. The native Fijians accused Sinha and his friend of cursing at them and proceeded to beat them, causing Sinha's face to bleed and giving him a black eye.

Second, in May 2000 — just after the coup in which native-Fijian supremacist George Speight deposed the country's first Indo-Fijian prime minister and attempted to take power himself — petitioners' apartment was stoned by a native Fijian mob. The mob also destroyed petitioners' car, smashing all the windows, ripping the seats, stealing the stereo, and vandalizing the dashboard with a knife. Sinha testified that the apartments of other Indo-Fijian residents on his block were also stoned.

Third, at 3:00 one morning in June 2000, two native Fijians broke into petitioners' apartment while they were sleeping. One of the burglars held a knife to Sinha's throat and restrained his wife, while the other went through their drawers, ultimately stealing $2,300 in cash and jewelry. As the burglars left the apartment, they shouted that petitioners should "go[ ] back to India." Although Sinha reported the incident to the police, the police officers with whom he spoke told him "that nothing was going to be done because it was

just a formality to take a report." The police officers, native Fijians, also told Sinha that he and Singh "were not supposed to be in Fiji anyway and that [they] had no legal rights." Later on, when Sinha went to the police station to follow up on the matter, an officer told him that the station had lost the report.

Fourth and finally, in September 2000, Sinha was attacked and robbed by three native Fijian men as he was walking toward a bus stop, having just left the bank where he cashed his paycheck. During the attack, the native Fijians called Sinha an "Indian dog" and berated him with the slogan, "Fiji is for Fijians only." Sinha sustained injuries on his face and back from the beating, and he required medical care as a result. Sinha reported the incident to the police, but, as far as he is aware, no investigation was ever conducted.

Sinha also testified that, in addition to the incidents he personally experienced, his wife and several other family members and Indo-Fijian friends have been attacked and harassed by native Fijians. In particular, in August 2000, Sinha's wife, Singh, was confronted by five native Fijian youths who were members of a gang called the "shoe-shine boys." According to Sinha's testimony, the shoe-shine boys formed their gang after the May 2000 coup, and their goal was to "shine" Fiji by ridding it of its Indian minority population. The youths yelled racial slurs at Singh and chased her down the street as she was leaving the local grocery store. Additionally, Sinha testified that his mother and uncles have been forced out of their leaseholds by native landowners.[3]

In October 2000, petitioners were admitted to the United States on tourist visas. Before the expiration of those visas, Sinha submitted an application for asylum, withholding of

---

[3]Sinha's country-conditions evidence confirms that Indo-Fijians are forbidden by law to own land in Fiji. They can only rent, which makes them vulnerable to extortionate pricing and intimidation by their native Fijian landlords.

removal, and relief under the CAT, seeking derivative relief for his wife. On June 25, 2001, Sinha and Singh were served with a Notice to Appear, and removal proceedings commenced. At their merits hearing on June 10, 2003, the IJ made no adverse credibility finding, but determined that Sinha's account of his experiences in Fiji did not demonstrate past persecution or support a well-founded fear of future persecution. The IJ therefore denied Sinha's application for asylum and withholding of removal. The IJ also denied relief under the CAT. On appeal, the BIA adopted and affirmed the IJ's decision. Petitioners timely filed a petition for review with this Court (No. 04-73843).

While that petition for review was pending, in December 2006, Fiji experienced yet another coup. In January 2007, petitioners filed a motion to reopen with the BIA, contending that the coup and resulting political instability in Fiji represented a material change in country conditions sufficient to merit reopening their removal proceedings under 8 C.F.R. § 1003.2(c)(3)(ii). The BIA denied the motion to reopen. Petitioners filed a timely petition for review of that decision with this Court (No. 07-72289), which we consolidated with their pending petition for review.

## II.   ANALYSIS

### A.   Asylum and withholding of removal

We consider first whether the IJ and BIA erred in determining that Sinha was ineligible for asylum and withholding of removal. Because the BIA "adopt[ed] and affirm[ed]" the IJ's decision without adding any commentary of its own, we treat the IJ's decision as that of the BIA. *See Molina-Estrada v. INS*, 293 F.3d 1089, 1093 (9th Cir. 2002). In reviewing the IJ's findings of fact underlying his decision that Sinha did not establish past persecution, we apply the substantial evidence standard. *See Hoque v. Ashcroft*, 367 F.3d 1190, 1194 (9th Cir. 2004). Throughout, because the IJ made no adverse credi-

bility finding, we take Sinha's testimony as true. *See Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1251 (9th Cir. 2004).

The Ninth Circuit has defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc) (internal quotation marks and citation omitted). Persecution is an "extreme concept [and] does not include every sort of treatment our society regards as offensive." *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995) (internal quotation marks and citation omitted). To establish past persecution, "an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." *Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000).

Here, the IJ held that Sinha failed to demonstrate that the harm he suffered between May and September 2000 was "persecution" within the meaning of the Immigration and Nationality Act (INA). He gave one reason for that conclusion: In what we will call the "nexus" finding, the IJ found that Sinha failed to show that the harm was "on account of" his race. The IJ made no finding as to whether the government was "unable or unwilling" to control Sinha's attackers (what we will call a "government inability" finding), or as to the severity of the harm Sinha suffered (what we will call a "severity" finding), presumably because the nexus finding alone, if proper, would be adequate to support the IJ's ultimate conclusion that Sinha had not demonstrated eligibility for asylum.

Petitioners submit that the IJ's nexus finding is unsupported by substantial evidence. We agree. The record compels the conclusion that the past harm Sinha suffered *was* "on account of" his race. Because the IJ based his denial of asylum on an erroneous finding, and because he made no specific finding as to the government's inability to control the attackers or the

severity of the harm Sinha suffered, the denial of asylum cannot stand, but must be reconsidered by the agency on remand.

### 1. The IJ's nexus finding

The IJ held that "in terms of what happened to this respondent, and the circumstances under which it happened, this Court is far from convinced that it happened necessarily because of his race, religion, nationality, or ethnic group." Rather, the IJ concluded, the separate incidents about which Sinha testified — the four concerning him and the one concerning his wife — were better characterized as manifestations of "random violence." In the IJ's view, "[w]hat this respondent describes are general incidents of criminality and random violence and lawlessness which occurred during and after the coup of 2000. . . . [C]onditions of political upheaval which affect the populus as a whole are insufficient to establish an alien's eligibility for asylum."

**[1]** The IJ's characterization of the record is unsupported by substantial evidence. The violence about which Sinha testified did not affect the "populus as a whole." Rather, individuals of Indo-Fijian ethnicity were the specific targets of the widespread violence. The IJ acknowledged as much in the very next sentence of his decision after the one just quoted, stating, "In this particular case, the specific segment of the population affected, for the most[ ] part[,] is the Indo-Fijian population of Fiji."

**[2]** Sinha's testimony presented specific evidence that his and his wife's attackers had racially discriminatory motives — evidence that the IJ mentioned in the fact section of his decision but ignored in his analysis. In all five of the specific incidents about which Sinha testified, petitioners were attacked by ethnic Fijians. Of course, this fact does not in itself demonstrate that the attackers' actions were racially motivated, but it does provide *some* circumstantial evidence of their motivation, particularly given the high level of racial

tension during and after the coup of May 2000, when most of these incidents occurred. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (stating that petitioner must produce "*some* evidence[,] . . . direct *or circumstantial*[,]" of his persecutor's motive) (second emphasis added). Sinha testified that the stoning of his home and the destruction of his car in May 2000 occurred in the context of widespread looting and violence targeted at Indo-Fijians. He also stated that "there were a lot of Indo-Fijians living in those blocks, and not only I[,] but all of us were the victim[s] of the stoning." The country-conditions evidence he submitted confirms that such attacks on Indo-Fijians did occur during this time.

**[3]** Further, during the nighttime burglary that occurred in June 2000, Sinha testified that "[t]he native Fijian[ ] [burglars] . . . shouted on the[ir] way [out of the apartment] . . . about us going back to India." We have held before that the use of ethnic slurs in the course of an attack "amply establishes the connection between the acts of persecution and [the petitioner's] ethnicity." *Baballah v. Ashcroft*, 367 F.3d 1067, 1077 (9th Cir. 2003). The fact that the attackers were also evidently motivated by a desire to steal petitioners' money and valuables does not undercut the role that racial animus played in their motivation. Persecutors can have multiple motives. In a pre-REAL ID case such as this one, so long as the petitioner shows that his attackers "[were] motivated, at least in part, by a[ ] . . . protected ground," that is sufficient to establish that the action was "on account of" a protected ground within the meaning of 8 U.S.C. § 1101(a)(42)(A). *Borja v. INS*, 175 F.3d 732, 736 (9th Cir. 1999) (en banc) (internal quotation marks and citation omitted); *see also Gafoor,* 231 F.3d at 654.[4]

---

[4]The "at least in part" standard of *Borja* and *Gafoor* has been superseded by the REAL ID Act, Pub. L. No. 109-13, div. B, § 101(h)(2), 119 Stat. 231, 305 (2005), which now requires that an asylum applicant show that a protected characteristic was "one central reason" for his persecution. *See Parussimova v. Mukasey,* 533 F.3d 1128, 1134 (9th Cir. 2008). Because Sinha filed his asylum application before May 11, 2005, however, we apply the pre-REAL ID standard, without deciding whether the result would be different under the REAL ID Act standard.

Sinha's testimony amply establishes that the burglars' motivation was, "at least in part," racial animus.

Moreover, we have held that where members of an ethnic majority view an ethnic minority as "economically powerful," and where that perceived economic inequality serves as a "justification" for acts of hatred or violence against the minority, their acts may be cognizable as persecution "on account of" race under the INA. *Sael v. Ashcroft*, 386 F.3d 922, 926 (9th Cir. 2004). Here, the record shows that Indo-Fijians are popularly believed to be better educated, more successful in business, and wealthier than ethnic Fijians. That Sinha's ethnic Fijian burglars may have targeted him in part because they believed he, as an Indo-Fijian, would likely have valuables to steal, does not mean that they did not single him out "on account of" his race. The burglars' use of ethnic slurs demonstrates that they did.

**[4]** As to the incident in September 2000, when several Fijian men attacked Sinha as he was walking from the bank to a bus stop, Sinha testified that his attackers used "racial slurs" while beating him: "They said something like you Indian dog, what are you doing here, you should go back, you should go back to India. And Fiji is for Fijians only." Again, the IJ neglected to address the significance of these slurs in his nexus analysis. A reasonable decisionmaker would have concluded, in light of Sinha's attackers' abusive language, that they were motivated at least in part by racial animus.

In addition, as to the incident in August 2000 when a gang of youths chased Singh from a grocery store, Sinha testified that the gang called themselves the "shoe-shine boys" not only because they did shine shoes, but also because "it was a racial slogan just like shining the shoes, they will do it, they would shine Fiji without the Indians." He further testified that the group "emerged mostly after May 2000, and they create havoc in the cities." The IJ ignored this evidence of racial motivation in his oral decision. Instead, he flippantly pro-

fessed confusion about why the gang was so called: "As to precisely what this gang consisted of, it is difficult to determine, except that the gang was composed, for the most part, of ethnic Fijians and they were in fact shoe-shine boys." Contrary to the IJ's mischaracterization of Sinha's testimony, there was substantial evidence that Sinha's closest family member, his wife, was targeted for mistreatment on ethnic grounds.

[5] We have held that, in certain cases, harm to a petitioner's close family members or associates may be relevant to assessing whether the petitioner suffered past persecution. *See Mashiri v. Ashcroft*, 383 F.3d 1112, 1121 (9th Cir. 2004); *Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir. 1998). We have also held that a petitioner's fear of future persecution "is weakened, even undercut, when similarly-situated family members" living in the petitioner's home country are *not* harmed. *Hakeem v. INS*, 273 F.3d 812, 816 (9th Cir. 2001). Just as these rulings recognize that the circumstance of close relatives can be informative in determining whether an individual suffered past, or will suffer future, persecution, so it stands to reason that the circumstance that Sinha's similarly-situated wife — like him, an ethnic Indian — was harassed on account of her race bolsters Sinha's argument that the attacks directed at him during the same time period were similarly motivated by anti-Indian sentiment.

[6] In sum, in light of all the evidence, the IJ's conclusion that the incidents about which Sinha testified were merely acts of random violence is unsupportable. What the IJ described is not random violence, but violence with a distinct racial slant. While it is true that the existence of widespread civil unrest, even unrest with a racial element to it, is not by itself enough for a petitioner to meet the definition of a refugee, *see Lolong v. Gonzales*, 484 F.3d 1173, 1179-80 (9th Cir. 2007) (en banc), it is also true that the existence of civil unrest does not undercut an individual's claim of persecution based on incidents specific to him. *See Ndom v. Ashcroft,* 384 F.3d

743, 752 (9th Cir. 2004). To suggest, as the IJ did, that the violence directed against one individual is somehow *less* "on account of" his race because many other individuals of his ethnic group are *also* being targeted on account of their race is entirely illogical and has no support in the case law. We therefore hold that substantial evidence does not support the IJ's conclusion with respect to the nexus finding.

## 2.  The IJ's government failure to make an inability finding

Turning to the second requirement for asylum — whether Sinha had demonstrated that the Fijian government was "unwilling or unable" to control his attackers — the IJ engaged in a brief and ultimately inconclusive discussion:

> [T]he [Immigration] Court is not satisfied in this particular case that the government in power does not make an attempt to control such incidents, nor under the circumstances are they unable to control the incidents with the possible exception of the incident which got totally out of control in May of 2000. Eventually, the military did have to step in and establish order. But in this particular case, I am not satisfied that the respondent has established that he has been persecuted on account of any one or more of the five . . . [protected grounds].

This passage is not a model of coherent reasoning, to be sure. Perhaps we could read it as articulating a finding that Sinha failed to show the Fijian government was "unwilling or unable" to control his attackers. *Avetovo-Elisseva v. INS*, 213 F.3d 1192, 1198 (9th Cir. 2000). If that is what the IJ meant to say, he provided no discernible reason for reaching such a conclusion, despite his recognition that events in Fiji "got totally out of control in May of 2000" — the first month in which Sinha's major incidents of mistreatment occurred. Nor did the IJ account for Sinha's testimony about his negative

interactions with the Fijian police, or the relevant country-conditions evidence concerning the government's general failure to control the attacks on Indo-Fijians that occurred in and shortly after May of 2000, and its slow response to complaints by injured parties. *See Krotova v. Gonzales*, 416 F.3d 1080, 1087 (9th Cir. 2005).[5]

[7] But we think the better reading of this passage is that the IJ simply declined to decide whether Sinha had shown that the Fijian government was unwilling or unable to control his attackers. Because he had already found that Sinha failed to establish that the harm he suffered was "on account of" his race or any other protected ground, the IJ considered it unnecessary to reach a government inability finding, and rested his denial of asylum on the nexus finding alone. For the reasons we explained above, that nexus finding cannot stand, as it is unsupported by substantial evidence. We therefore remand to the agency for a finding as to whether the Fijian government was willing and able to control Sinha's attackers.

### 3. The IJ's failure to make a severity finding

[8] The third and final element needed to establish past persecution is severity — that is, a petitioner must show that the harm he suffered rose to a level of offensiveness " 'extreme' " enough to be deemed persecution. *Ghaly*, 58 F.3d at 1431 (citation omitted). Here, too, the IJ's opinion is difficult to follow. But it appears that the IJ declined to make a finding as to whether the incidents of violence and harassment to which Sinha testified were sufficiently severe to amount to persecution. Rather, the IJ mentioned the severity prong, but subsumed his discussion of that prong in the discussion of the nexus prong. Ultimately, he found that Sinha was not harmed

---

[5]In discussing the bus-stop incident, the IJ did note that Sinha failed to report what happened to him "to the hospital" where he received medical care for his injuries. But that is a fact of marginal relevance, if any, to determining whether the government was able and willing to protect him.

on account of his race, without separately reaching a conclusion as to severity.

**[9]** Even were we to read the IJ's decision charitably and assume that he did mean to make an independent finding that the attacks on Sinha were not sufficiently severe to meet the definition of persecution, we could only conclude that any such finding rested on an erroneous legal standard — namely, that discriminatory acts cannot be persecution if they are widespread. The IJ suggested as much when he stated that "[t]he Board has indicated unequivocally that [the] hazards of personal injury which arise as a result of conflict between majority and minority ethnic groups is not persecution."

This understanding of the BIA's precedent is wrong. None of the cases cited by the IJ indicates that the circumstance of widespread ethnic conflict renders the harm an individual applicant suffers somehow less "severe" than it would otherwise be, and thus insufficiently severe to constitute persecution.[6]

---

[6]In each of the cases the IJ cited, the alien's asylum claim was rejected for some reason *other* than the existence of widespread strife — e.g., because the alien failed to make the required nexus showing, because the record did not show the government's inability or unwillingness to control the violence, or because the alien *personally* had not suffered sufficiently severe harm. *See Matter of Tan*, 12 I. & N. Dec. 564, 567 (BIA 1967) (rejecting alien's claim for withholding of removal because, in light of the facts "that he never experienced persecution prior to his departure from Indonesia" and that the Indonesian police had protected his family's property from mob violence in the past, he had not shown a sufficient likelihood that he would be victimized by ethnically-motivated mob violence in the future); *Matter of V-T-S-*, 21 I. & N. Dec. 792, 798-99 (BIA 1997) ("Kidnapping is a very serious offense. Seriousness of conduct, however, is not dispositive in our analysis [of whether the nexus requirement is satisfied]. Instead, the critical issue is whether . . . the motivation for the conduct was to persecute the asylum applicant on account of [a protected ground]. . . . [Here, m]oney was . . . one of the reasons for the kidnapping, and the evidence does not suggest that other motivations existed."); *Ghaly*, 58 F.3d at 1431 (holding that "where private discrimination is neither condoned by the state nor the prevailing social norm, it clearly does not

Moreover, this Court has definitively held, more than once, that individual persecution can occur in the context of widespread ethnic violence. *See Ndom*, 384 F.3d at 752 ("True, the existence of civil war or civil strife in an applicant's country of origin, by itself, does not establish eligibility for asylum. At the same time, the existence of civil strife does not alter our normal approach to determining refugee status or make a particular asylum claim less compelling.") (internal citations omitted); *Baballah*, 367 F.3d at 1077 ("The IJ's suggestion that the threats and attacks experienced by Baballah and his family cannot be considered persecution because of generally dangerous conditions is at odds with our case law."). Just as the fact of widespread ethnic violence does not make it harder for an alien to prove a nexus to a protected ground, *see Ndom*, 384 F.3d at 752, it also does not make it harder for the alien to establish the requisite degree of severity. *Baballah*, 367 F.3d at 1077.

On the contrary, we have repeatedly applied what has come to be called "disfavored group" analysis, *see Sael*, 386 F.3d at 925, in cases involving, among other groups, Indo-Fijian petitioners. We have explained that evidence of the pervasive mistreatment of an oppressed ethnic group makes it *easier*, not harder, for an individual member of that group to meet his burden of showing that there is at least a ten percent chance that he will be individually targeted in the future. *See Chand v. INS*, 222 F.3d 1066, 1076 (9th Cir. 2000) ("[W]here the

---

amount to 'persecution' within the meaning of the Act."); *Prasad v. INS*, 47 F.3d 336, 340 (9th Cir. 1995) (holding that general evidence of "poor conditions for, and discrimination against, ethnic Indians" was not sufficient to make out an asylum claim, because "[p]articularized individual persecution, not merely conditions of discrimination in the country of origin, must be shown before asylum will be granted"); *Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir. 1983) ("Shoaee has put forward no concrete evidence to support his contention that he might be persecuted because of his opinions and American associations were he to return to Iran. He has only established that it is likely his family's political fortunes have declined.").

petitioner establishes that many members of his or her group are targeted for persecution, *less* of an individualized showing is required to qualify for asylum, not more. . . . [T]hat other Indian Fijians have faced persecution similar to the persecution Chand suffered strengthens, rather than weakens, his claim.") (internal citations omitted) (emphasis in original); *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir. 1996) ("The more the group to which an applicant belongs is discriminated against, harassed, or subjected to violence, the less the individualized showing an applicant must make to establish eligibility for asylum. . . . [W]e reject the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum.").

**[10]** Our holding in *Singh v. INS*, 134 F.3d 962 (9th Cir. 1998), is not to the contrary. In *Singh*, we held that the stoning of an Indo-Fijian petitioner's home and repeated acts of vandalism on her property, during which the petitioner herself was never physically injured or even credibly threatened with injury, were "not so extreme that [they cumulatively] constitute[ ] persecution." *Id.* at 967. *Singh* explained that

> Petitioner must establish that the mistreatment she suffered was . . . substantially more grievous in kind or degree than the general manifestation of hostility between the competing ethnic and religious groups in Fiji. Mere generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum to everyone who wishes to improve his or her life by moving to the United States without an immigration visa.

*Id.* We do not read this passage to suggest, contrary to our other case law, that an alien who experiences harm that would otherwise rise to the level of persecution must show *more* or

qualitatively *worse* harm — or, in other words, faces a higher "severity" bar — purely because that harm occurred against a background of generalized ethnic strife. Rather, our understanding of *Singh*'s holding is that absent a successful "pattern or practice" claim,[7] a background of generalized lawlessness is not by itself sufficient to provide any individual petitioner with a successful asylum claim.

We recently reaffirmed this principle in an en banc opinion. In *Lolong*, we held that a petitioner could not make out a well-founded fear of future persecution by "rel[ying] *entirely* on fears common to ethnic Chinese Christian women generally[,]" and we emphasized that "Lolong did not make any argument that she feared being individually targeted for persecution." *Lolong*, 484 F.3d at 1180 (emphasis added; footnote omitted). In *Singh*, similarly, we required the petitioner to show what we called "substantially more grievous [mistreatment] . . . than the general manifestation of hostility," *not* because the existence of a general climate of hostility somehow made the petitioner's burden of proof heavier than it otherwise would be, but because that general climate of hostility was not itself enough to establish that Singh had suffered past persecution. *Singh*, 134 F.3d at 967.

**[11]** In sum, to the degree the IJ suggested that the fact that Indo-Fijians are frequently the victims of harassment, mistreatment, and worse undercuts the severity of the individualized harm suffered by this particular Indo-Fijian applicant, he erred. But, as it is not clear that the IJ in the end made any severity finding, we decline to make any such determination ourselves. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002).

---

[7]Under 8 C.F.R. § 208.13 (b)(2)(iii), if an asylum applicant can show that there is a sufficiently systematic "pattern or practice" of persecuting members of the protected group to which he belongs in his home country, he need not show evidence of a particularized threat to him to make out a well-founded fear of future persecution. *See Quan v. Gonzales*, 428 F.3d 883, 889 (9th Cir. 2005)*; Knezevic v. Ashcroft,* 367 F.3d 1206 (9th Cir. 2004); *Mgoian v. INS*, 184 F.3d 1029, 1035 (9th Cir. 1999).

Rather, we leave for the agency to decide in the first instance whether the harm that petitioners suffered rose to the level of persecution.[8]

## B.   CAT relief

Petitioners also challenge the BIA's determination that they are ineligible for relief under the CAT. Reviewing the BIA's determination for substantial evidence, *see Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003), we deny the petition for review on this issue.

[12] The BIA held that petitioners had failed to demonstrate that it was "more likely than not" that public officials would torture them, or consent to or acquiesce in their torture by non-governmental actors, if they were returned to Fiji. 8 C.F.R. § 1208.16(c)(2). The record does not contain evidence that would "compel[ ]" a reasonable factfinder to reach a contrary conclusion. *Elias-Zacarias*, 502 U.S. at 481 n.1. The regulations implementing CAT define torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind.

8 C.F.R. § 1208.18(a)(1); *see also Kamalthas v. INS*, 251 F.3d

---

[8]We also leave for the agency to decide on remand Sinha's claim that he is eligible for withholding of removal under 8 U.S.C. § 1231(b)(3), as eligibility for withholding of removal is based upon the same considerations as the request for asylum, although the requisite standard of proof differs. *See* 8 C.F.R. § 208.16(b)(1)(iii).

1279, 1282 (9th Cir. 2001). Petitioners do not claim that they have ever been subjected to treatment meeting this standard in the past, and they have failed to present evidence that they would be tortured in the future.

## III.   CONCLUSION

The record compels the conclusion that, contrary to the IJ's decision, the harm Sinha suffered was "on account of" his race. We remand to the agency to make a finding with respect to the second and third prongs of a past persecution analysis, government inability and severity. If the government was indeed unwilling and/or unable to control Sinha's attackers, and if the harm he suffered is sufficiently severe, he will have established past persecution and will be entitled to a rebuttable presumption that his fear of future persecution is well-founded. *See* 8 C.F.R. § 1208.13(b)(1)(i). Even if the agency determines that the harm Sinha suffered in the past cumulatively does not rise to the level of past persecution, it will be relevant to his ability to show a well-founded fear of future persecution if he is removed to Fiji, under the disfavored group approach.

Because we grant the petition for review of the BIA's affirmance of the IJ's decision denying asylum, it may not be necessary for us to decide whether the BIA erred in denying petitioners' subsequent motion to reopen based on changed circumstances. We therefore vacate submission of case No. 07-72289 pending further order of the court, and hold it in abeyance pending the BIA's ruling on remand. The parties are directed to notify the court immediately after the BIA's decision on remand.

No. 07-72289: SUBMISSION VACATED.

No. 04-73843: PETITION FOR REVIEW DENIED in part; GRANTED in part; REMANDED.